STATE OF NORTH CAROLINA v. HENRY LOUIS WALLACE

No. 241A97

(Filed 5 May 2000)

**1. Criminal Law— motion for appropriate relief—short-form indictments—constitutionality—jurisdiction issue**

Although defendant only challenged the constitutionality of the nine short-form murder indictments in an assignment of error in the amended record and filed a motion for appropriate relief to challenge the validity of the short-form indictments for the eight counts of first-degree rape and two counts of first-degree sexual offense, these issues were properly preserved because: (1) a challenge to an indictment alleged to be invalid on its face that could deprive the trial court of jurisdiction may be made at any time; and (2) defendant could challenge the trial court's jurisdiction by his motion for appropriate relief.

**2. Indictment and Information— short-form indictments— constitutionality**

The trial court did not err in concluding the short-form indictments used to charge defendant with nine counts of first-degree murder, eight counts of first-degree rape, and two counts of first-degree sexual offense do not violate defendant's right to due process under the Fifth and Fourteenth Amendments and his right to notice and trial by jury under the Sixth Amendment because: (1) indictments based on N.C.G.S. § 15-144, § 15-144.1, or § 15-144.2 are in compliance with both the North Carolina and United States Constitutions; (2) the United States Supreme Court has not applied the due process clause of the Fourteenth Amendment in a manner which requires that a state indictment for a state offense must contain each element and fact which might increase the maximum punishment for the crime charged; and (3) the United States Supreme Court has specifically declined to apply the Fifth Amendment requirement of indictment by grand jury to the states via the Fourteenth Amendment.

**3. Venue— motion for change—pretrial publicity—prejudice not shown**

The trial court did not abuse its discretion by failing to grant defendant's motion for change of venue under N.C.G.S. § 15A-957 based on pretrial publicity including extensive media coverage

and telephone surveys in a case involving defendant's convictions for nine counts of first-degree murder, eight counts of first-degree rape, one count of second-degree rape, two counts of first-degree sexual offense, two counts of second-degree sexual offense, one count of assault with a deadly weapon, and five counts of robbery with a dangerous weapon, because: (1) the trial court's recognition of the probable time frame for the trial as well as the size of the prospective jury pool was reasonable since they may have impacted whether the environment for defendant's trial was prejudicial; (2) the most reliable determination for whether pretrial publicity was prejudicial or inflammatory is jurors' responses to voir dire questioning; (3) there was no identifiable prejudice shown by a juror who formed an opinion about defendant's guilt prior to trial since he later clearly stated his ability to set aside that opinion and base his decision on the evidence and the law as presented; (4) there was no showing of infection of the jury pool depriving defendant of a fair trial where there is a large heterogeneous group of potential jurors, and the danger of juror familiarity with the victims and their families was not present like in a small close-knit venire; (5) factual news accounts of the crimes and pretrial proceedings are not sufficient to establish prejudice against a defendant; and (6) the telephone surveys did not measure the prejudicial effect of the media coverage.

4. **Confessions and Incriminating Statements— delay—voluntariness—Miranda warnings—no fruit of the poisonous tree**

The trial court did not err by denying defendant's motion to suppress his pretrial statements to police in a case involving defendant's convictions for nine counts of first-degree murder, eight counts of first-degree rape, one count of second-degree rape, two counts of first-degree sexual offense, two counts of second-degree sexual offense, one count of assault with a deadly weapon, and five counts of robbery with a dangerous weapon, because: (1) the delay in taking defendant before a judicial official was not unnecessary within the meaning of N.C.G.S. § 15A-501(2) in light of the number of crimes to which defendant confessed, the amount of time necessary to record the details of the crimes, the investigators' accommodation of defendant's request to sleep; furthermore, there was no indication that taking defendant to the Law Enforcement Center before he saw a magistrate caused him to confess, no indication that police asked defendant about any of the crimes to which he later confessed

before he was read his Miranda rights, and no indication that any portion of his confession was a result of the delay during which he discussed unrelated subjects with investigators; (2) defendant's later confessions could not be termed "fruit of the poisonous tree" since there was no prior inadmissible statement or evidence to function as the "poisonous tree"; and (3) investigators did not improperly induce defendant to confess based on their statements that they would attempt to contact defendants' girlfriend and the mother of his child since they made the statement only in response to defendant's request to see his girlfriend and hold his child, defendant admitted his confession was not given in exchange for the request to see his girlfriend and child, and investigators advised defendant that the police had no control over whether they would come to the station.

**5. Jury— selection—capital trial—challenge for cause—ability to set aside opinion**

The trial court did not err by denying defendant's challenge for cause of a prospective juror who formed an opinion about defendant's guilt prior to trial based on pretrial publicity and defense counsel's statement that the facts were not in dispute in a case involving defendant's convictions for nine counts of first-degree murder, eight counts of first-degree rape, one count of second-degree rape, two counts of first-degree sexual offense, two counts of second-degree sexual offense, one count of assault with a deadly weapon, and five counts of robbery with a dangerous weapon, because during voir dire, the juror clearly stated his ability to set aside that opinion and base his decision on the evidence and the law as presented.

**6. Evidence— expert testimony—cross-examination—basis of opinion—confessions of additional unrelated murders—limiting instruction—no unfair prejudice**

The trial court did not abuse its discretion by denying defendant's motion in limine and by overruling his objections to the cross-examination of defense experts regarding two additional and unrelated murders to which defendant confessed after his arrest in a case involving defendant's convictions for nine counts of first-degree murder, eight counts of first-degree rape, one count of second-degree rape, two counts of first-degree sexual offense, two counts of second-degree sexual offense, one count of assault with a deadly weapon, and five counts of robbery with a dangerous weapon, because: (1) N.C.G.S. § 8C-1, Rule 705

allows cross-examination of experts regarding the basis for any opinion, and both experts testified they were able to classify or diagnose defendant, in part, by studying the acts to which he confessed; and (2) the trial court was aware of the balancing required by N.C.G.S. § 8C-1, Rule 403 for potential danger of unfair prejudice to defendant, and was careful to give a proper instruction limiting the jury's consideration of the evidence solely to the basis for the experts' opinions.

## 7. Homicide— deliberation—requested instructions—verbatim not required

The trial court did not err by denying parts of defendant's requested instructions on the element of deliberation in a prosecution for nine counts of first-degree murder because: (1) the trial court is not required to give a requested instruction verbatim as long as the instruction, if correct in law and supported by evidence, is given in substance; (2) the trial court utilized the North Carolina pattern jury instructions, which provide an adequate definition of deliberation; and (3) defendant's proposed instructions merely articulate variations on the definition.

## 8. Sentencing— capital—peremptory instructions—statutory mitigating circumstances—controverted evidence

The trial court did not err by denying defendant's motion for a peremptory instruction regarding the two statutory mitigating circumstances of N.C.G.S. § 15A-2000(f)(2), a capital felony committed while defendant was under the influence of mental or emotional disturbance, and N.C.G.S. § 15A-2000(f)(6), the capacity of defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was impaired, in a capital sentencing proceeding involving defendant's convictions for nine counts of first-degree murder because the expert testimony upon which defendant relies was controverted through evidence including: (1) defendant's girlfriend, who had lived with defendant for two years until shortly before he was arrested, testified she had not observed anything unusual about defendant and had not known him to experience hallucinations; (2) defendant held numerous jobs involving management responsibilities during the time these crimes were committed; (3) defendant maintained a relationship with his girlfriend and other women during this time which did not involve any type of abuse; and (4) defendant was able to carry out nine premeditated, calculated, and vicious murders while carefully avoiding detection.

**9. Sentencing— capital—aggravating circumstances—pecuniary gain—pattern jury instruction**

Even though defendant failed to object at trial, the trial court did not commit plain error in its instruction on the N.C.G.S. § 15A-2000(e)(6) pecuniary gain aggravating circumstance as to three victims in a capital sentencing proceeding involving defendant's convictions for nine counts of first-degree murder because the trial court's instruction mirrored the pattern jury instruction.

**10. Sentencing— capital—aggravating circumstances—pecuniary gain—sufficiency of evidence**

The trial court did not err by submitting the N.C.G.S. § 15A-2000(e)(6) aggravating circumstance, that the capital felony was committed for pecuniary gain, for the murder of one of the victims because the evidence that the victim's boss gave her a roll of quarters as she left work the night of her death, along with defendant admitting in his statement to the police that he took the quarters from the victim's apartment, is such that a jury could reasonably conclude pecuniary gain was a motive for the murder.

**11. Criminal Law— prosecutor's argument—capital sentencing—imagining emotions and fear**

The trial court did not err by overruling defendant's objection to the prosecutor's statements during the sentencing phase closing argument to "think about being murdered during the course of being raped" in a case involving defendant's convictions for nine counts of first-degree murder, eight counts of first-degree rape, one count of second-degree rape, two counts of first-degree sexual offense, two counts of second-degree sexual offense, one count of assault with a deadly weapon, and five counts of robbery with a dangerous weapon, because even though arguments asking jurors to put themselves in the place of the victims will not be condoned, the prosecution is allowed to ask the jury to imagine the emotions and fear of a victim.

**12. Criminal Law— prosecutor's argument—capital sentencing—sympathy for victims—mistrial properly denied**

The trial court did not abuse its discretion by denying defendant's motion for mistrial in a capital sentencing proceeding based on the prosecution's alleged improper argument that the defense did not want the jurors to play a sympathy game in a case involv-

ing defendant's convictions for nine counts of first-degree murder because the trial court sustained defendant's objection to the statement and remedied any prejudice by instructing the jury not to consider the statement.

**13. Sentencing— capital—death penalty not disproportionate**

　　The trial court did not err by imposing nine death sentences for nine counts of first-degree murder because: (1) a sentence of death has never been found to be disproportionate in North Carolina where the jury has found defendant guilty of murdering more than one victim; (2) defendant was convicted under the theory of premeditation and deliberation for each murder; and (3) the jury found the three aggravating circumstances under N.C.G.S. § 15A-2000(e)(5), § 15A-2000(e)(9), and § 15A-2000(e)(11) for each murder, all of which standing alone our Supreme Court has held to be sufficient to support a sentence of death.

　　Appeal as of right pursuant to N.C.G.S. § 7A-27(a) from judgments imposing nine sentences of death entered by Johnston, J., on 29 January 1997 in Superior Court, Mecklenburg County, upon jury verdicts finding defendant guilty of nine counts of first-degree murder. Defendant's motion to bypass the Court of Appeals as to his appeal of additional judgments was allowed by the Supreme Court on 9 March 1999. Heard in the Supreme Court 16 November 1999.

*Michael F. Easley, Attorney General, by Ellen B. Scouten, Special Deputy Attorney General, for the State.*

*Malcolm Ray Hunter, Jr., Appellate Defender, by Benjamin Dowling-Sendor, Assistant Appellate Defender, for defendant-appellant.*

WAINWRIGHT, Justice.

　　On 4 April 1994, defendant Henry Louis Wallace was indicted for the murders of (1) Caroline Love, (2) Shawna Hawk, (3) Audrey Ann Spain, (4) Valencia M. Jumper, (5) Michelle Stinson, (6) Vanessa Little Mack, (7) Betty Jean Baucom, (8) Brandi June Henderson, and (9) Deborah Slaughter. In addition, defendant was indicted for the following crimes: (1) first-degree rape of Love, (2) second-degree rape of Hawk, (3) two counts of second-degree sexual offense against Hawk (fellatio and cunnilingus), (4) first-degree rape of Spain, (5) robbery with a dangerous weapon of Spain, (6) first-degree rape of

Jumper, (7) first-degree sexual offense against Jumper, (8) first-degree rape of Stinson, (9) first-degree sexual offense against Stinson, (10) first-degree rape of Mack, (11) robbery with a dangerous weapon of Mack, (12) first-degree rape of Baucom, (13) robbery with a dangerous weapon of Baucom, (14) first-degree rape of Henderson, (15) robbery with a dangerous weapon of Henderson, (16) assault with a deadly weapon inflicting serious injury against T.W., Henderson's ten-month-old son, (17) assault on a child under twelve years of age against T.W., (18) first-degree rape of Slaughter, and (19) robbery with a dangerous weapon of Slaughter.

Between September 1996 and January 1997, defendant was tried capitally before a jury. On 7 January 1997, the jury found defendant guilty of nine counts of first-degree murder, each on the basis of malice, premeditation, and deliberation, and under the felony murder rule. In addition, the jury found defendant guilty of eight counts of first-degree rape, one count of second-degree rape, two counts of first-degree sexual offense, two counts of second-degree sexual offense, one count of assault with a deadly weapon, one count of assault on a child under the age of twelve, and five counts of robbery with a dangerous weapon.

After a capital sentencing proceeding, the jury recommended a sentence of death for each of the nine counts of first-degree murder. On 29 January 1997, the trial court entered judgment in accordance with the recommendations and sentenced defendant to nine death sentences. In addition, the trial court sentenced defendant to eight consecutive life sentences for the first-degree rape convictions, a consecutive forty-year sentence for the second-degree rape conviction, two consecutive life sentences for the first-degree sexual offense convictions, two consecutive forty-year sentences for the second-degree sexual offense convictions, five consecutive forty-year sentences for the robbery with a dangerous weapon convictions, and a consecutive two-year sentence for the assault on a child under the age of twelve conviction. The trial court arrested judgment on the assault with a deadly weapon conviction. Defendant appeals to this Court as of right from the sentences of death. Defendant's motion to bypass the Court of Appeals on the other convictions was allowed by this Court on 9 March 1999.

The State presented evidence tending to show that defendant murdered nine women in the Charlotte area over a two-year period. Defendant was identified as a suspect in three of the later murders by

a palm print found on the car of one of the victims. As will be detailed below, defendant was arrested on an outstanding larceny charge and interrogated by police. He confessed to the murders of Caroline Love, Shawna Hawk, Audrey Spain, Valencia Jumper, Michelle Stinson, Vanessa Mack, Betty Baucom, Brandi Henderson, and Deborah Slaughter. The State presented the following evidence:

### Caroline Love Murder

On 15 June 1992, Caroline Love was living in an apartment with Sadie McKnight, defendant's girlfriend. That night, after completing her shift at the Bojangles' restaurant on Central Avenue in Charlotte, Love asked the night manager if she could buy a roll of quarters to do her laundry. The night manager exchanged a roll of quarters for a ten-dollar bill, and Love left the premises. As Love walked toward her apartment, her cousin, Robert Ross, saw her walking, offered her a ride, and drove her home. Ross watched as Love entered her apartment.

A few days later, Love's employer contacted Love's sister, Kathy Love (Kathy), and informed her that Love had not come to work in two days. Kathy went to Love's apartment and left a note. However, the next day, Kathy was again informed Love had not come to work. Kathy then contacted defendant, whom she knew, to find Love's roommate, McKnight. Kathy, McKnight, and defendant went to the police station to file a missing person report. Later, Kathy went into Love's apartment. She noticed that some of the furniture had been moved and that the sheets from Love's bed were missing, but there was no evidence of Love's whereabouts. During the investigation of the missing person report, Investigator Tony Rice of the Charlotte-Mecklenburg Police Department determined that the roll of quarters Love bought prior to leaving work on 15 June 1992 was missing from her apartment. Love was not found as a result of the missing person report.

On 13 March 1994, defendant confessed to the murder of Caroline Love. At trial, the State introduced redacted versions of defendant's tape-recorded confession. In the confession, defendant stated he made a copy of McKnight's house key and went to the apartment when neither McKnight nor Love was there. Defendant heard Love enter the apartment. He indicated to Love that he was in the bathroom and would leave as soon as he came out. Upon coming out of the bathroom, however, defendant went into the living room where Love was watching television and kissed her on the cheek. Love

promised not to tell McKnight about the kiss if defendant promised not to do it again. Defendant then put his arms around Love in a manner similar to a wrestling choke hold. Defendant confessed that there was a scuffle, that Love scratched him on his arms and face, and that he kept holding Love until she passed out. Defendant then moved Love to her bedroom, removed her clothes, tied her hands behind her back with the cord of a curling iron, and placed tape over her mouth. Defendant had oral sex and sexual intercourse with Love, during which she was semiconscious. While engaged in intercourse with Love, defendant continued to apply the choke hold because Love began to regain consciousness. Defendant applied the choke hold until Love's body became limp. Defendant stated he could tell she was still alive because he could feel her heart and pulse. Afterwards, defendant strangled Love to death.

Defendant further confessed that he left the apartment to move his car closer to the stairwell and then returned to the apartment with a large orange trash bag. Defendant wrapped Love's body in a bed sheet and put the body inside the trash bag. Defendant placed some clothing into another bag to make it appear Love had left. Defendant carried the bags down the stairs, placed them in the backseat of his car, and then drove around Charlotte trying to find a place to dump Love's body. Defendant stopped the car while driving down Statesville Road, removed the trash bag containing Love's body from his car, and dumped the bag into the woods. The following day, defendant drove back to the location because he feared the orange bag would be noticeable from the road. Defendant stated that he removed the body from the orange trash bag and then moved the body into a shallow ravine. Defendant also admitted taking a roll of quarters from Love's dresser.

Later on 13 March 1994, after defendant's confession, defendant directed Rice and other investigators to the site where he had dumped Love's body. Subsequently, Dr. James Michael Sullivan, a forensic pathologist and medical examiner employed by the Medical Examiner's Office of Mecklenburg County, went to the area of Statesville Road to recover Love's skeletal remains. Dr. Sullivan performed an autopsy on those remains. Based on the history provided by the police, the absence of any significant findings to contradict a history of strangulation, and the location of the unclothed remains in a wooded area, Dr. Sullivan determined that the cause of death was homicide by means of strangulation.

Shawna Hawk Murder

In February 1993, Shawna Hawk was living with her mother, Sylvia Denise Sumpter, in Charlotte. Hawk was a paralegal student at Central Piedmont Community College and worked at a Taco Bell restaurant on Sharon Amity Road, where defendant was her manager. On 19 February 1993, Sumpter arrived home and began to cook dinner. Hawk's car was not there, but Sumpter saw Hawk's coat and purse in a closet. This seemed unusual because it was very cold outside, Hawk never went anywhere without her purse, and Sumpter had seen Hawk earlier in the day wearing the coat. Sumpter called Hawk's boyfriend, Darryl Kirkpatrick, to ask if he had seen Hawk, but Kirkpatrick said he had not.

Sumpter then learned that Hawk was to have picked up her godson from daycare but had not done so. Sumpter looked through Hawk's purse and noticed that her keys were not there and that some money was missing. Kirkpatrick arrived at the home to comfort Sumpter. Kirkpatrick and Sumpter decided to file a missing person report and called the police. Subsequently, Kirkpatrick walked through the house looking in each room. He entered a bathroom downstairs and noticed the shower curtain outside the bathtub. When Kirkpatrick pulled the shower curtain back, he saw Hawk curled up and submerged in water. Kirkpatrick ran upstairs and told Sumpter to call 911. Emergency personnel arrived, tried to resuscitate Hawk, and then transported her to the hospital, where she was pronounced dead.

On 20 February 1993, Dr. Sullivan performed an autopsy on Hawk's body. He discovered a contusion on the left side of Hawk's scalp above the ear and a laceration of the left eardrum with some hemorrhaging behind the eardrum evidencing a blunt trauma prior to death. Dr. Sullivan indicated that based on the bruising present, the blow occurred prior to death but that it was unlikely that the blow caused unconsciousness. Dr. Sullivan also observed hemorrhages in the lining of the eyes (conjunctiva), on the skin of the face, in the lining of the mouth, and in the muscles in the front of the neck overlying the voice-box area, all of which were an indication of ligature strangulation. Dr. Sullivan defined a ligature as "an instrument, a cord or a band or something that's made into a cord or a band, then circles the neck and is used to forcibly compress the neck." Based on his observations, Dr. Sullivan opined that the cause of Hawk's death was ligature strangulation.

Defendant confessed that he stopped by Hawk's home to see her and that they talked for a while. As defendant was leaving, Hawk gave him a hug. Defendant then told Hawk he wanted her to have sex with him. Defendant took Hawk to her bedroom, told her to remove her clothing, and told her to perform oral sex on him, which she did. Then, defendant performed oral sex on Hawk. The two then engaged in sexual intercourse. Defendant admitted that Hawk was afraid and cried the whole time. Afterwards, defendant told Hawk to put her clothes on, and he took her into the bathroom. Defendant placed Hawk in a choke hold, with her head between his arms, until she passed out. Defendant then filled the bathtub with water and placed Hawk in it. Defendant also admitted taking fifty dollars from Hawk.

### Audrey Spain Murder

In June 1993, Audrey Spain, age twenty-four, lived in an apartment in Charlotte. On 23 June 1993, Spain was to report to work at 6:30 p.m. at a Taco Bell restaurant on Wendover Road. Spain did not show up for work. Mark Lawrence, Spain's manager, thought it was unusual for Spain not to come to work, so he drove by Spain's apartment that evening. Lawrence saw Spain's car in the parking lot. Lawrence then called Spain and left a message on her answering machine.

The next morning, 24 June 1993, Lawrence rode by Spain's apartment and again saw her car in the lot. Lawrence called Spain's sister and left a message to express his concern. Spain did not show up for work that evening. Spain's sister never returned Lawrence's call, so Lawrence called 911. Thereafter, officers periodically rode by the apartment and knocked on the door, but got no response.

On 25 June 1993, maintenance personnel from the apartment complex entered the apartment through a sliding glass door and discovered Spain's body on the bed. Lawrence again stopped by Spain's apartment, and an officer informed Lawrence they had discovered Spain dead in her apartment.

On 26 June 1993, Dr. Sullivan conducted an autopsy on Spain's body. There was a ligature made from a T-shirt and a bra around Spain's neck with the end of the T-shirt stuffed into her mouth. After removing the ligature, Dr. Sullivan discovered a furrow, or mark, left by the ligature. Dr. Sullivan also observed hemorrhages in the conjunctiva, on the skin of the face, in the voice box, and in the muscles in the front of the neck, as well as minor blunt-trauma injuries,

including a small facial abrasion, small linear abrasions on her right back and on the knee, and a small contusion over the right hip. Dr. Sullivan opined that the cause of death was strangulation.

Defendant confessed that he went to Spain's house and that they smoked marijuana together. Defendant admitted that his motive for visiting Spain was robbery. He stated that he put Spain in a choke hold in her living room and inquired about the combination for the safe at her workplace, but she said she did not know the combination. Defendant also asked about money in her personal bank account, but she said she did not have any money because she had just returned from a vacation. Defendant said he did not remember asking Spain to remove her clothes. Spain begged defendant not to hurt her, but defendant maintained the choke hold until Spain passed out. Defendant then dragged Spain into her bedroom and had intercourse with her. Afterwards, defendant took Spain into the bathroom, where he put her into the shower to wash off any evidence. Defendant placed Spain into her bed and tied a T-shirt and bra around her neck. Before leaving, defendant took Spain's keys and Visa credit card. He used the Visa card to purchase gas. Defendant returned to Spain's apartment to make phone calls so it would seem as though she had not died on the day defendant killed her.

### Valencia Jumper Murder

In August 1993, Valencia Jumper was a senior at Johnson C. Smith University in Charlotte, studying political science. She also worked at Food Lion on Central Avenue and at Hecht's in South Park Mall. On 9 August 1993, a friend of Jumper's, Zachery Douglas, spoke with Jumper on the phone about meeting later that night. Subsequently, Douglas arrived at Jumper's apartment in the early morning hours of 10 August 1993 and noticed smoke coming from her apartment. Douglas testified that he turned the door knob, and the door was unlocked, so he opened the door. Douglas stated that there was too much smoke for him to enter the apartment any further. Douglas then alerted a neighbor, who called the fire department.

As firefighters arrived on the scene to fight the fire, firefighter Dennis Arney entered the kitchen and noticed that a burner on the stove had been left on. Based on examinations at the fire scene, the information provided by firefighters, and the observed pattern the fire traveled, the investigators believed the fire originated from a pot left burning on the stove. Firefighters found Jumper's body in the bedroom of her apartment.

On 10 August 1993, Dr. Sullivan performed an autopsy on Jumper's body. Jumper's body was extensively charred. Dr. Sullivan was told that the fire was thought to have been accidentally caused by a pot of beans left burning on the stove. However, he found no soot in Jumper's airway, indicating there was no significant inhalation of smoke during the fire. After learning there was no carbon monoxide in Jumper's blood, Dr. Sullivan listed thermal burns as the cause of death. After defendant's confession, Dr. Sullivan reexamined the Jumper autopsy and amended the cause of Jumper's death. Dr. Sullivan testified that the cause of Jumper's death was strangulation.

Defendant confessed to Jumper's murder. He indicated that Jumper was like a little sister to him and that they often spent time with one another. On the night in question, defendant stated that he stopped by Jumper's apartment and that they talked for a while and then defendant left. Defendant later returned to Jumper's apartment and asked her to call McKnight because they had gotten into a fight. When Jumper reached toward the phone, defendant put her in a choke hold. Defendant told Jumper to go to the bedroom. Jumper begged defendant not to hurt her and stated she would do anything he wanted. Jumper removed her clothes. Defendant and Jumper engaged in oral sex and sexual intercourse. Afterwards, while Jumper was putting her clothes back on, defendant put a towel around her neck and choked her until she passed out. Defendant stated that Jumper started bleeding from the nose, so he kept the pressure on the towel for about five minutes until he felt no pulse. Then defendant wiped his fingerprints from certain areas of the apartment. Defendant went into the kitchen and noticed a bottle of rum, so he took the bottle to the bedroom and poured the rum on Jumper's body, on the bed, and on the floor nearby. Defendant then went back into the kitchen, opened a can of beans, put the beans in a pot on the stove, and turned the stove on high. Defendant took the battery out of the smoke detector. Defendant went back into the bedroom, lit a match, and threw it on Jumper's rum-soaked body before leaving the apartment. Defendant returned to the apartment twenty minutes later. When he saw smoke rushing out the door, he left and went home. Defendant admitted taking jewelry from Jumper's body and pawning it in a local pawn shop.

## Michelle Stinson Murder

In September 1993, Michelle Stinson, age twenty, lived in an apartment in Charlotte, with her two young sons. On 15 September

1993, Stinson's friend, James Mayes, stopped by her apartment to visit with Stinson and her children. Mayes knocked on the front door, but no one answered. Mayes heard the children knocking on the window and telling him their mother was sleeping on the kitchen floor. Mayes thought they were playing a game, but Stinson did not answer. Mayes had turned to leave when the oldest child came out the back door and grabbed him. Mayes picked up the child and went back into the apartment through the back door. Mayes discovered Stinson lying on the kitchen floor with blood around her. Mayes picked up the phone but realized the cord had been cut or jerked out of the wall. Mayes took the children and asked neighbors to help him find a phone. He then called the police.

Dr. Sullivan performed an autopsy on Stinson's body on 16 September 1993. He discovered four stab wounds to the left side of the back. Two of the four stab wounds caused injury to the heart and lungs and were potentially fatal. Dr. Sullivan also observed evidence of ligature strangulation in the form of a band of abrasions and contusions over the front of the neck and small hemorrhages in the skin of the face, the conjunctiva, and internally in the muscles of Stinson's neck. Dr. Sullivan opined that the cause of Stinson's death was stab wounds to the chest with strangulation as a contributing cause.

Defendant confessed that he stopped by Stinson's apartment around 11:00 p.m., with the intention of raping and murdering her. They talked for a while, and then defendant got ready to leave and they hugged. At that point, defendant told Stinson that he wanted to have sex with her and that he wanted her to remove her clothes. Stinson told defendant she was sick, but defendant did not believe her and wanted her to produce some sort of medication, which she could not do. Defendant began to choke Stinson. Stinson then agreed to have sex with defendant and removed her clothes. Defendant told Stinson he wanted her to perform oral sex on him, but she stated she did not know how. Defendant responded, "well you're about to learn." Stinson then performed oral sex on defendant. After having sexual intercourse on the kitchen floor, defendant administered a choke hold until Stinson became unconscious. Defendant strangled Stinson with a towel he had retrieved from the bathroom. Stinson began to gasp for air, so defendant took a knife and stabbed her approximately four times. Defendant used a washcloth to wipe his fingerprints from a glass, the door, the phone, the wall, and the floor. Before defendant left the apartment, Stinson's oldest son awoke, and defendant told him to go back to bed. Defendant left through the back door, using a

towel to avoid leaving fingerprints, and threw the knife and wash-cloth over a fence near the back of Stinson's apartment.

### Vanessa Mack Murder

In February 1994, Vanessa Mack was living in an apartment in Charlotte with her two young daughters. She worked at Carolinas Medical Center. On 20 February 1994, Barbara Rippy, the grand-mother of Mack's oldest daughter, went to Mack's apartment to pick up Mack's youngest daughter, as she did every Sunday morning so Mack could go to work. Rippy arrived at 6:00 a.m. and went to the back door, but the door was ajar. Rippy called out, but Mack did not respond. As she entered, Rippy noticed Mack's four-month-old daughter lying on the couch, which she felt was unusual. Rippy entered the bedroom and saw Mack's feet hanging off the side of the bed. Rippy testified that Mack's feet were the only part of her body exposed and that they appeared gray and felt cold. Rippy called 911. Rippy then picked up Mack's daughter and went outside. As she left the apart-ment, fire department and police department vehicles arrived.

Officer Jeffrey Bumgarner of the Charlotte-Mecklenburg Police Department found Mack lying on her bed. Bumgarner observed a towel around Mack's neck and blood coming from her nose, ears, and the back of her head. Bumgarner also noticed a pocketbook, with its contents scattered on the bed.

Dr. Sullivan performed an autopsy on Mack's body on 21 February 1994. He observed minimal evidence of blunt trauma as well as evidence of strangulation. There was a ligature in place around Mack's neck. The ligature was made of a long-sleeve pull-over type shirt and a towel. Dr. Sullivan also observed small hemorrhages in the conjunctiva, on the skin of the face, and in the muscles in the front of the neck. He also observed small areas of bruising beneath the liga-ture likely caused by the pinching of the ligature. Dr. Sullivan opined that the cause of Mack's death was strangulation.

Defendant confessed that he had been in Mack's neighborhood and had called to see if she was at home. When she answered, he hung up the phone. He then walked over to her apartment. Defendant admitted that his motives for going to see Mack were robbery, to sup-port his cocaine addiction, and murder. Defendant stated that he tried to find a way to maneuver Mack into the position he needed in order to administer a choke hold, but she refused to give defendant a hug, so he asked for something to drink. When Mack turned her back,

defendant pulled out a pillowcase he had brought with him and placed it around her neck. As Mack resisted, defendant put more pressure on the pillowcase and explained that this was a robbery. Defendant and Mack went into the bedroom, where defendant commanded Mack to give him all the money she had, including her automated teller machine (ATM) card and personal identification number (PIN). After Mack gave defendant everything, he told her to remove her clothes, which she did. Defendant and Mack engaged in sexual intercourse. Afterwards, defendant told Mack to put her clothes back on. Defendant then tightened the pillowcase around Mack's neck until she passed out. Defendant added another garment to keep the pillowcase from loosening. Defendant then checked on Mack's baby and stayed until the baby went to sleep. Defendant left the apartment, walked down the street, and called a cab. Later, defendant attempted to use the ATM card at several banks and discovered that the PIN given to him by Mack was not correct.

## Betty Baucom Murder

In March 1994, Betty Baucom lived in an apartment in Charlotte with her adopted daughter. On 9 March 1994, Baucom, an assistant manager at the Bojangles' restaurant on Central Avenue, was scheduled to work, but she did not report to work. Baucom's unit director, Jeffrey Ellis, called Baucom's apartment several times but received no answer. Ellis also talked with some of Baucom's co-workers, but no one had heard from her. Additionally, Ellis called Baucom's mother, but she had not heard from Baucom.

The next morning, Ellis became increasingly worried because Baucom was again scheduled to work but did not report. Neither Baucom's mother nor Baucom's aunt had heard from Baucom. Ellis and another employee drove to Baucom's apartment to check on her. They knocked on the door and looked in the windows, and everything appeared normal. Ellis then called Baucom's mother again. Ellis and Baucom's mother decided to contact the police department, and they reported Baucom as a missing person.

Officer Gregory Norwood of the Charlotte-Mecklenburg Police Department received a call on the morning of 10 March 1994 to respond to an apartment where a young woman had been found. She was not breathing. Maintenance personnel let Norwood into the apartment. Norwood discovered Baucom's body lying facedown on her bed with a towel around her neck. Approximately an hour after Ellis called police, an officer approached Ellis in the parking lot of

the Bojangles' restaurant and told him they had found Baucom's body.

Dr. Sullivan performed an autopsy on Baucom's body on 11 March 1994. He observed blunt-trauma injuries and evidence of strangulation, including a ligature in place around her neck. The ligature consisted of a small sheet or pillowcase in a knot with an additional towel wrapped between the skin of the neck and the sheet. Dr. Sullivan observed small abrasions and small contusions of the skin of the neck beneath the ligature and small hemorrhages in the conjunctiva. Additionally, Dr. Sullivan observed abrasions over the left shoulder, both arms, the right upper chest, and the abdomen, and a blunt-trauma injury to the head with an area of abrasion over the right forehead. During the internal examination, Dr. Sullivan observed a buildup of blood in the lungs, enlargement of the brain, small hemorrhages in the muscles in the front of the neck, and small hemorrhages in the lining of the voice box. He testified that the injuries observed were consistent with a struggle. Dr. Sullivan opined that the cause of Baucom's death was strangulation.

Defendant confessed that he went to Baucom's apartment and told her he needed to use the phone. Baucom let defendant into her apartment. They talked for a while. As defendant was getting ready to leave, he placed a choke hold on Baucom, and she fell to the floor. Defendant told her this was a robbery and demanded the alarm code, keys, and combination to the safe for the Bojangles' restaurant where Baucom was the manager. Baucom was very upset, and she took approximately thirty minutes to produce the safe's combination. Defendant then released the choke hold. Defendant remembered Baucom asking, "Why did you do that to me?" Defendant responded that he was a sick person and that he had hurt many people. Baucom then embraced defendant, said that she forgave him, and told him he needed help. Defendant stated he then became enraged and grabbed Baucom by the throat, slammed her to the floor, and then scuffled with her. Defendant got Baucom to her feet and took her into the bedroom, where he told her to remove her clothes. Baucom told defendant she did not want to remove her clothes because she had a medical problem. She then showed defendant a rash, which defendant stated looked like an ordinary rash. Defendant then told Baucom he wanted her to perform oral sex on him. She grabbed his penis and started pulling and scratching. Defendant and Baucom began to scuffle again, and defendant sustained a bite on his shoulder and scratches on his abdomen. Defendant was able to tighten the towel

around Baucom's neck until she was nearly unconscious. At this point, Baucom removed her clothes and engaged in sexual intercourse with defendant. Afterwards, defendant told Baucom to put her clothes back on. He then placed a towel around her neck and asked her if she had any money. Baucom gave defendant the money in her purse, and he took a gold chain from around her neck.

After strangling Baucom to death, defendant took her television and left in her car. Defendant sold the television for drugs. He then returned to Baucom's apartment to make sure Baucom was dead and to take her VCR. While in Baucom's apartment, defendant used a wet cloth to wipe off the phone, door knobs, and the wall on which some of the struggle took place. Defendant used money from Baucom's purse, the gold chain, and the VCR to purchase more drugs. Defendant kept Baucom's car almost two days. Defendant then left the car in a parking lot, because he thought police officers were following him. Defendant stated that he wiped the interior and most of the exterior of the car, but forgot to wipe the trunk lid.

## Brandi Henderson Murder

In March 1994, Brandi Henderson was living in an apartment with her boyfriend, Verness Lamar Woods, and their ten-month-old son, T.W. On 9 March 1994, Woods was at the apartment taking care of T.W. because Henderson had a doctor's appointment. As Henderson was leaving, defendant went to the apartment to say he was leaving town. Defendant stayed for only a few minutes and then left. Henderson returned during the afternoon. Around five o'clock in the evening, Woods left to go to work. When Woods left, Henderson and T.W. were alone in the apartment, the apartment was neat and clean, and the front door was locked. Woods returned to the apartment around midnight to find the front door unlocked, items scattered about the living room, and the stereo missing. Woods then went through the apartment. He first came to T.W.'s bedroom where he turned on the light and saw T.W. sitting on the bed gasping for air with something white coming out of his mouth and a pair of shorts around his neck. Woods immediately ran to T.W. to remove the shorts, which were tied tightly around T.W.'s neck. Woods then realized that Henderson was lying facedown on the bed. Woods rolled her onto her back and saw that towels were tied around her neck and that her face was blue. Woods removed the two towels from Henderson's neck and then called 911. He moved Henderson's body from the bed to the floor and began administering CPR pursuant to instructions from the 911 operator.

When police officers arrived, it was obvious Henderson was dead. T.W. was taken to the hospital.

Upon being taken to Carolinas Medical Center, Dr. Tom Brewer examined T.W. in the emergency room. Dr. Brewer testified that T.W. was awake, breathing, and had stable vital signs. However, his failure to pull away when stuck with a needle was some evidence that he was not acting normally. There were red marks around T.W.'s neck consistent with something being tied around his neck. In addition, there was very fine bruising on T.W.'s cheeks and eyelids caused by a buildup of blood pressure as a result of his jugular vein being blocked. Moreover, T.W.'s altered mental status indicated his brain was not functioning normally because of some compromise of blood flow to the brain. Within fifteen to thirty minutes, T.W. became more alert and began interacting with his environment. Dr. Brewer testified that he believed the ligature and T.W.'s injuries caused great pain and suffering.

Dr. Sullivan performed an autopsy on Henderson's body on 10 March 1994. Dr. Sullivan observed minor blunt-trauma injuries and lacerations. He also observed evidence of strangulation including small hemorrhages in the eyes, over the skin of the face and neck, in the muscles in the front of the neck, and in the lining of the voice box. Dr. Sullivan opined that the cause of death was strangulation.

Defendant confessed that he planned to murder Henderson on Tuesday morning, but when he arrived at the apartment, Woods was present. Defendant left the apartment, found Baucom's apartment in the same apartment complex, and murdered Baucom. He returned to Henderson's apartment the same night when he knew Woods would be at work. Defendant pretended he had something to leave for Woods. Henderson and defendant talked for a while, and then defendant asked for something to drink. When Henderson reached into the cabinet, defendant choked her and told her to go into the bedroom. Henderson begged defendant to allow her to hold her son, but he said, "I don't know if that would be a good idea for what we're about to do." Defendant told her this was also going to be a robbery and demanded money. Henderson gave defendant a "Pringle's" can filled with approximately twenty dollars worth of coins and said there was no other money in the house. Defendant also told Henderson he would be taking the television and stereo when he left. Defendant then told Henderson to remove her clothes, which she did. Henderson grabbed her son, laid him across her chest, and turned his

head away so he could not see what was going on. Defendant and Henderson started to have sexual intercourse in Henderson's bedroom but moved to T.W.'s bedroom so he would not cry. Once in T.W.'s room, defendant and Henderson continued to have sexual intercourse, with T.W. lying across Henderson's chest. Afterwards, defendant told Henderson to put her clothes back on, and he put his clothes on. Defendant went into the bathroom, got a towel, and wiped off everything. Thereafter, defendant folded the towel, put it around Henderson's neck, and strangled her to death. Henderson's body fell to the floor. Defendant picked up Henderson's body and put it onto T.W.'s bed. He also tied the towel in a knot around her neck. T.W. started crying, so defendant gave him a pacifier. Defendant looked for something T.W. could drink but could not find anything. Defendant then took another towel from the bathroom and tied the towel tight around T.W.'s neck so it would be difficult for him to breathe and so he would stop crying. T.W. stopped crying and laid down next to his mother's body. Defendant then ran into the living room, disconnected the stereo, and loaded it into Baucom's car. Defendant also took a television that was sitting on the floor. Before leaving, defendant took some food that had been delivered and the container of coins. Defendant sold the television and stereo for $175.00 which he used to purchase crack cocaine.

## Deborah Slaughter Murder

In March 1994, Deborah Slaughter lived alone in an apartment in Charlotte. On 12 March 1994, Slaughter's mother, Lovey Slaughter (Lovey), went to Slaughter's apartment to return a picture she had taken a few days before. Lovey had a key to the apartment and anticipated letting herself in because Slaughter was supposed to be at work. When Lovey arrived, she knocked on the door and got no response. She put the key into the lock and discovered the door was not locked. As Lovey walked through the door, she saw Slaughter's body lying on the floor. Lovey called 911.

Officer Ronnie Chambers of the Charlotte-Mecklenburg Police Department entered Slaughter's apartment and found a purse with its contents scattered on the floor. Chambers then noticed Slaughter's body lying on the floor faceup. There was white fabric in Slaughter's mouth and a towel around her neck. Chambers also observed several puncture wounds in Slaughter's chest.

On 14 March 1994, Dr. Sullivan performed an autopsy on Slaughter's body. During the external examination, he observed a lig-

ature around Slaughter's neck and a sock balled up and stuffed into her mouth, holding her mouth open. The evidence of strangulation included the ligature around Slaughter's neck and hemorrhages in the conjunctiva. The ligature was comprised of two towels, the inner towel encircled around the neck, and the outer towel tied tightly in a single knot. Dr. Sullivan also observed blunt-trauma injuries, including abrasions of the skin of the face and a single scalp contusion. Additionally, Dr. Sullivan observed sharp-trauma injuries caused by thirty-eight stab wounds to the chest and abdomen. Three of the stab wounds caused injury to the heart, and twelve of the stab wounds caused injury to the left lung; each of these stab wounds could have been fatal. Stab wounds also caused injury to the liver and stomach. Dr. Sullivan opined that Slaughter's death was caused by multiple stab wounds, with strangulation as a contributing factor in the death.

Defendant confessed that he went to Slaughter's apartment to use drugs with her. Defendant realized that Slaughter had some money when she said she could not buy any drugs because she had to make her money last until the next week. Defendant asked Slaughter to get him something to drink. As Slaughter turned around, defendant put a towel he brought with him around Slaughter's neck and tightened it. Slaughter fell to her knees. Defendant stated that Slaughter then realized that defendant was the one who had killed two other girls in nearby apartments. Defendant told Slaughter to remove her clothes and to perform oral sex on him. Defendant remembered Slaughter saying, "I don't do that; you might as well go ahead and kill me." Defendant tightened the towel and asked if she wanted to change her mind. Slaughter stated that she would not perform oral sex on defendant. Defendant engaged in sexual intercourse with Slaughter. Afterwards, defendant told Slaughter to put her clothes on. Defendant, knowing Slaughter carried a knife in her purse at all times, asked Slaughter to empty the contents of her purse onto the floor, which she did. Defendant kicked the knife away and then told Slaughter to open the wallet and give him everything in it. As Slaughter did this, defendant grabbed the knife. Slaughter handed defendant forty dollars from the wallet. Slaughter hit defendant and screamed for the police. Defendant then tightened the towel around Slaughter's neck until she fell to the floor and started kicking. Defendant tightened the towel more and tried to sit on top of Slaughter's legs to keep Slaughter from alerting the neighbor downstairs. Defendant went to the bathroom to retrieve another towel, which he tied with the first around Slaughter's neck. Defendant

stabbed Slaughter with the knife from her purse approximately twenty times in the abdomen. Defendant then washed the knife clean and wiped his fingerprints from it and placed it back with the contents of Slaughter's purse on the floor.

Defendant left Slaughter's apartment to purchase crack cocaine. He returned to Slaughter's apartment to smoke the crack cocaine. When he left the second time, defendant took a coat, a baseball hat, and a butcher knife from Slaughter's apartment. Defendant threw all three items away after leaving the apartment.

The State also introduced evidence regarding the investigation which led to defendant's arrest. Following the Henderson murder on 9 March 1994, which was discovered prior to the Baucom murder, investigators noticed similarities between the Henderson murder and the Mack murder. Both victims were black females, there was no forced entry in either case, and there was a ligature used in both cases.

On 10 March 1994, investigators held a meeting to discuss similar cases involving strangulation. During this meeting, investigators learned that another victim, Baucom, had been discovered in the same apartment complex as Henderson. The Baucom murder exhibited characteristics similar to the Mack and Henderson cases. Defendant became a suspect in these crimes when investigators asked victims' family members and friends for the names of persons the victims might have allowed into their apartments. Defendant's name was on the list.

On 11 March 1994, after Baucom's vehicle was recovered, police compared a palm print lifted from Baucom's vehicle to defendant's prints and found a match. Investigators then began an extensive search for defendant based on an outstanding warrant for his arrest on a larceny charge.

On 12 March 1994, during the search for defendant, investigators learned that Slaughter had been discovered in her apartment. The Slaughter case exhibited characteristics similar to the Mack, Henderson, and Baucom cases.

Between 5:30 and 6:00 p.m. on 12 March 1994, defendant was arrested on the outstanding order for arrest. During questioning, after defendant had been advised of his *Miranda* rights, investigators told defendant of the evidence connecting defendant to the crimes, including photos of defendant attempting to use Mack's ATM card at

teller machines and the matching palm print from Baucom's car. Defendant confessed to the murders of Love, Hawk, Spain, Jumper, Stinson, Mack, Baucom, Henderson, and Slaughter. Defendant did not testify at trial but presented evidence from three expert witnesses. Further facts necessary to the discussion of the issues raised by defendant will be presented as needed.

## PRETRIAL ISSUES

[1] By an assignment of error contained in an amendment to the record allowed by this Court on 19 August 1999, defendant contends the short-form indictments used to. charge him with nine counts of first-degree murder are constitutionally inadequate. In addition, in a motion for appropriate relief filed on 28 October 1999, defendant challenges the constitutionality of the short-form indictments charging him with eight counts of first-degree rape and two counts of first-degree sexual offense.

Initially, we address whether these issues are properly before this Court. Defendant did not contest the murder indictments at trial but argues that a jurisdictional issue can be raised at any time. Defendant contends that the constitutionally inadequate indictments deprived the trial court of jurisdiction to hear the cases. He makes the same jurisdiction argument with regard to the rape and sexual offense indictments contested in his motion for appropriate relief.

It is well settled that "a constitutional question which is not raised and passed upon in the trial court will not ordinarily be considered on appeal." *State v. Hunter*, 305 N.C. 106, 112, 286 S.E.2d 535, 539 (1982). An attack on an indictment is waived when its validity is not challenged in the trial court. *See State v. Robinson*, 327 N.C. 346, 361, 395 S.E.2d 402, 411 (1990). However, where an indictment is alleged to be invalid on its face, thereby depriving the trial court of its jurisdiction, a challenge to that indictment may be made at any time, even if it was not contested in the trial court. *See, e.g., State v. McGaha*, 306 N.C. 699, 295 S.E.2d 449 (1982); *State v. Sellers*, 273 N.C. 641, 161 S.E.2d 15 (1968). As to the indictments challenged in defendant's motion for appropriate relief, this Court has. held that a motion for appropriate relief filed while an appeal is pending properly raises the issue of an indictment's conferral of jurisdiction to a trial court. *See State v. Sturdivant*, 304 N.C. 293, 307-08, 283 S.E.2d 719, 729 (1981). Although a motion for appropriate relief generally does not allow a defendant to raise an issue that could have been raised on direct appeal, *see* N.C.G.S. § 15A-1419(a)(3) (1999), a chal-

lenge to the trial court's jurisdiction may be raised by a motion for appropriate relief. Therefore, these issues are properly before this Court.

[2] Defendant argues the short-form indictments violate his right to due process under the Fifth and Fourteenth Amendments to the United States Constitution and his rights to notice and trial by jury under the Sixth Amendment. Defendant contends the United States Supreme Court's recent ruling in *Jones v. United States*, 526 U.S. 227, 143 L. Ed. 2d 311 (1999), requires a finding that the short-form indictments are unconstitutional because they fail to allege all of the elements of the crimes charged. Specifically, he argues they fail to allege those elements which differentiate first-degree murder, rape, and sexual offense from second-degree murder, rape, and sexual offense. We disagree.

Each of the nine indictments against defendant for murder utilized the same language:

> THE JURORS FOR THE STATE UPON THEIR OATH PRESENT that on or about the [date] day of [month], [year], in Mecklenburg County, Henry Louis Wallace did unlawfully, wilfully, and feloniously and of malice aforethought kill and murder [victim's name].

Only the names of the victims and the dates of the murders differed from one indictment to the next. Each of these indictments complied with N.C.G.S. § 15-144, which provides for a short-form version of an indictment for murder:

> In indictments for murder and manslaughter, it is not necessary to allege matter not required to be proved on the trial; but in the body of the indictment, after naming the person accused, and the county of his residence, the date of the offense, the averment "with force and arms," and the county of the alleged commission of the offense, as is now usual, it is sufficient in describing the murder to allege that the accused person feloniously, willfully, and of his malice aforethought, did kill and murder (naming the person killed), and concluding as is now required by law; . . . and any bill of indictment containing the averments and allegations herein named shall be good and sufficient in law as an indictment for murder or manslaughter, as the case may be.

N.C.G.S. § 15-144 (1999). This Court has consistently held indictments based on this statute are in compliance with both the North

Carolina and United States Constitutions. *See, e.g., State v. Kilpatrick*, 343 N.C. 466, 472, 471 S.E.2d 624, 628 (1996); *State v. Avery*, 315 N.C. 1, 12-14, 337 S.E.2d 786, 792-93 (1985); *State v. Williams*, 304 N.C. 394, 422, 284 S.E.2d 437, 454 (1981), *cert. denied*, 456 U.S. 932, 72 L. Ed. 2d 450 (1982).

Similarly, the eight indictments against defendant for first-degree rape contained identical language with the exceptions of the dates and victims' names:

THE JURORS FOR THE STATE UPON THEIR OATH PRESENT that on or about the [date] day of [month], [year], in Mecklenburg County, Henry Louis Wallace did unlawfully, wilfully and feloniously with force and arms engage in vaginal intercourse with [victim's name], by force and against the victim's will.

The two indictments for first-degree sexual offense also used the same language, substituting the phrase "a sexual act" for "vaginal intercourse." Each of these indictments complied with the statutes authorizing short-form indictments for rape and sexual offense. *See* N.C.G.S. §§ 15-144.1, -144.2 (1999). Indictments under these statutes have been held to comport with the requirements of the North Carolina and United States Constitutions. *See, e.g., State v. Randolph*, 312 N.C. 198, 210, 321 S.E.2d 864, 872 (1984); *State v. Lowe*, 295 N.C. 596, 604, 247 S.E.2d 878, 883-84 (1978).

Defendant's argument is based on *Jones*, 526 U.S. 227, 143 L. Ed. 2d 311. In *Jones*, the United States Supreme Court was called upon to interpret the federal carjacking statute, 18 U.S.C. § 2119, as it was written at the time of the offense. The statute provided:

Whoever, possessing a firearm as defined in section 921 of this title, takes a motor vehicle that has been transported, shipped, or received in interstate or foreign commerce from the person or presence of another by force and violence or by intimidation, or attempts to do so, shall—

(1) be fined under this title or imprisoned not more than 15 years, or both,

(2) if serious bodily injury (as defined in section 1365 of this title) results, be fined under this title or imprisoned not more than 25 years, or both, and

STATE v. WALLACE

[351 N.C. 481 (2000)]

(3) if death results, be fined under this title or imprisoned for any number of years up to life, or both.

18 U.S.C. § 2119 (Supp. V 1993). The question presented to the Court was whether the statute provided for one offense with three maximum penalties or three separate offenses. The majority recognized the susceptibility of the statute to both readings but reasoned that a finding of three separate offenses would avoid a significant constitutional problem. In subsections (2) and (3), the statute provides for greater punishment if either serious bodily injury or death results from the carjacking. *See id.* The Court determined that the findings in subsections (2) and (3) which allowed for greater punishments amounted to additional elements of the respective offenses subject to the requirements of the Fifth and Sixth Amendments. The Court restated the principle:

> [U]nder the Due Process Clause of the Fifth Amendment and the notice and jury trial guarantees of the Sixth Amendment, any fact (other than prior conviction) that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt.

*Jones*, 526 U.S. at 243 n.6, 143 L. Ed. 2d at 326 n.6. To avoid the possibility that a greater punishment might be imposed without the predicate fact or element being charged in the indictment or submitted to a jury for proof beyond a reasonable doubt, the Court held three separate offenses existed and one specific offense must be charged from the outset. *Id.* at 252, 143 L. Ed. 2d at 331.

In the instant case, defendant cites to the principle stated in footnote six above as a restatement of constitutional law which requires any indictment, whether it be for a state or federal offense, to charge all facts which might increase the maximum penalty for the crime. Defendant contends that this pronouncement reaffirms a line of United States Supreme Court cases defining due process. He further argues that this Court's prior rulings confirming the constitutionality of short-form indictments were in error.

We first examine the cases which defendant claims require all of the facts or elements to be alleged in the indictment. In *Hodgson v. Vermont*, 168 U.S. 262, 42 L. Ed. 461 (1897), the United States Supreme Court reviewed the information upon which the defendant was tried and convicted for violations of Vermont's liquor laws.

Stating the due process requirements for charging a defendant, the Court noted:

> that in all criminal prosecutions the accused must be informed of the nature and cause of the accusation against him; that in no case can there be, in criminal proceedings, due process of law where the accused is not thus informed, and that the information which he is to receive is that which will acquaint him with the essential particulars of the offence, so that he may appear in court prepared to meet every feature of the accusation against him.

*Id.* at 269, 42 L. Ed. at 463. While the Court held a defendant must be made aware of the "nature and cause" of the charge against him and the "essential particulars of the offence," the holding does not require every element of an offense or every fact which might increase the maximum punishment to be charged in an indictment.

Defendant also cites *Mullaney v. Wilbur*, 421 U.S. 684, 44 L. Ed. 2d 508 (1975), and *Patterson v. New York*, 432 U.S. 197, 53 L. Ed. 2d 281 (1977), which address the due process requirements of the United States Constitution in prosecutions for state offenses. In each of these cases, the due process issue was whether certain facts or elements had to be proven to a jury beyond a reasonable doubt. Due process as applied to the states via the Fourteenth Amendment "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364, 25 L. Ed. 2d 368, 375 (1970). In *Jones*, the Court engaged in a discussion of *Mullaney* and *Patterson*. Defendant contends this discussion infers an intent by the Court to extend the due process requirement of the Fifth Amendment as detailed in *Jones* to the Fourteenth Amendment as discussed in *Mullaney* and *Patterson*. We discern no such intent. The holdings in *Mullaney* and *Patterson* make no mention of the requirements of an indictment and only apply the proof beyond a reasonable doubt standard to all elements of a crime. Likewise, in *McMillan v. Pennsylvania*, 477 U.S. 79, 91 L. Ed. 2d 67 (1986), the Court, in determining the proper standard by which a sentence-enhancement finding must be made, addressed the applicability of the reasonable doubt standard. There was no discussion of the requirements of an indictment.

Defendant also cites *United States v. Gaudin*, 515 U.S. 506, 132 L. Ed. 2d 444 (1995), and *Hamling v. United States*, 418 U.S. 87,

41 L. Ed. 2d 590 (1974), as further evidence that the requirement that all elements be listed in an indictment is well established. However, these cases along with *Jones* involve application of Fifth Amendment due process which applies to the federal government and federal prosecutions, not to the state prosecution of a state offense, as in this case. *See also Almendarez-Torres v. United States*, 523 U.S. 224, 140 L. Ed. 2d 350 (1998); *Hodgson*, 168 U.S. 262, 42 L. Ed. 461.

Defendant has not cited, and we have not discovered, any United States Supreme Court case which has applied the Due Process Clause of the Fourteenth Amendment in a manner which requires that a state indictment for a state offense must contain each element and fact which might increase the maximum punishment for the crime charged. Furthermore, it is informative to note the United States Supreme Court has specifically declined to apply the Fifth Amendment requirement of indictment by grand jury to the states via the Fourteenth Amendment. *See Hurtado v. California*, 110 U.S. 516, 28 L. Ed. 232 (1884). The Court's refusal to incorporate the grand jury indictment requirement into the Fourteenth Amendment along with the lack of precedent on this issue convinces us that the Fourteenth Amendment does not require the listing in an indictment of all the elements or facts which might increase the maximum punishment for a crime. Indeed, the Supreme Court specifically stated that its decision in *Jones* "announce[d] [no] new principle of constitutional law, but merely interpret[ed] a particular federal statute in light of a set of constitutional concerns that have emerged through a series of our decisions over the past quarter century." *Jones*, 526 U.S. at 251-52 n.11, 143 L. Ed. 2d at 331 n.11. In light of our overwhelming case law approving the use of short-form indictments and the lack of a federal mandate to change that determination, we decline to do so. Defendant's arguments in objection to his indictments for first-degree murder, first-degree rape, and first-degree sexual offense are without merit and are overruled.

[3] By an assignment of error, defendant next contends the trial court erred by failing to grant his motions for change of venue. Defendant filed a motion to change venue on 9 August 1994. The trial court conducted an extensive and lengthy evidentiary hearing on defendant's motion from 23 January through 27 January 1995, at which time defendant presented evidence of pretrial publicity, including numerous television and newspaper reports and two press conferences held by Charlotte-Mecklenburg Police Department officials. Defendant also presented evidence of a telephone survey conducted

by Dr. Robert Bohm, a criminal justice professor at the University of North Carolina at Charlotte, which measured public opinion regarding the cases.

At the hearing, defendant argued that the pretrial publicity was prejudicial and inflammatory and that the attitude of the community, as exemplified by the comments of public officials, the media, and responses to polling, was such that he could not receive a fair trial in this venue. The trial court orally denied defendant's motion, making the following findings of fact:

> The passage of time and the publicity or lack thereof after the pole [sic] was taken, could amelierate [sic] or exacerbate the responses to the questions about which the Defendant expressed concerns.

> Mecklenburg County is a large urban county with a population of approximately five hundred thousand, and a voting aged population probably in excess of three hundred fifty thousand.

> To quote defense counsel, quote, "it is a large diverse county with many intelligent people", period, end quote.

With regard to the pretrial publicity, the trial court found some of the coverage to be "inflammatory and misleading" but found the remaining coverage either "favorable" to defendant or "factual, informative, and not inflammatory or prejudicial." The trial court concluded that defendant "has not established . . . a reasonable likelihood that pretrial publicity would prevent him from receiving a fair and impartial trial in Mecklenburg County."

On 30 September 1996, defendant renewed his motion and presented evidence of a second telephone survey conducted by Dr. Katherine Jamieson, an associate professor of criminal justice at the University of North Carolina at Charlotte. Defendant also presented evidence detailing additional newspaper and television reports regarding defendant and the crimes with which he was charged. The trial court denied defendant's renewed motion to change venue. Defendant introduced evidence to supplement his motion to change venue on at least three additional occasions before and during the trial. The trial court denied each renewed motion to change venue.

On appeal, defendant contends the trial court erred in denying his motions to change venue because (1) the trial court's reasons for its initial denial of his motion were improper and amounted to an abuse

of discretion; (2) there was identifiable prejudice caused by the trial court's rulings in that a juror who expressed an opinion regarding defendant's guilt or innocence served on the jury over defendant's objection; and (3) the pool of potential jurors was infected by pretrial publicity, making it reasonably unlikely that defendant could receive a fair trial in Mecklenburg County. We disagree.

We begin our review of defendant's assignment of error by restating the applicable law. N.C.G.S. § 15A-957, which governs motions for change of venue, provides:

> If, upon motion of the defendant, the court determines that there exists in the county in which the prosecution is pending so great a prejudice against the defendant that he cannot obtain a fair and impartial trial, the court must either:
>
> (1) Transfer the proceeding to another county in the prosecutorial district as defined in G.S. 7A-60 or to another county in an adjoining prosecutorial district as defined in G.S. 7A-60, or
>
> (2) Order a special venire under the terms of G.S. 15A-958.

N.C.G.S. § 15A-957 (1999). The test for determining whether a motion for change of venue should be allowed is well settled.

> A defendant's motion for a change of venue should be granted when he establishes that it is reasonably likely that prospective jurors would base their decision in the case upon pretrial information rather than the evidence presented at trial and would be unable to remove from their minds any preconceived impressions they might have formed.

*State v. Jerrett*, 309 N.C. 239, 254-55, 307 S.E.2d 339, 347 (1983). The burden of proof in a hearing on a motion for change of venue rests with the defendant. *See State v. Madric*, 328 N.C. 223, 226, 400 S.E.2d 31, 33 (1991). To meet that burden, a defendant must "establish specific and identifiable prejudice against [defendant] as a result of pretrial publicity" and "must show *inter alia* that jurors with prior knowledge decided the case, that [defendant] exhausted his peremptory challenges, and that a juror objectionable to [defendant] sat on the jury." *State v. Billings*, 348 N.C. 169, 177, 500 S.E.2d 423, 428 (emphasis omitted), *cert. denied*, 525 U.S. 1005, 142 L. Ed. 2d 431 (1998). The determination of whether a defendant has carried his burden is within the sound discretion of the trial court, and absent a

showing of abuse of discretion, its ruling will not be overturned on appeal. *See Madric*, 328 N.C. at 226-27, 400 S.E.2d at 33-34; *State v. Gardner*, 311 N.C. 489, 497, 319 S.E.2d 591, 598 (1984), *cert. denied*, 469 U.S. 1230, 84 L. Ed. 2d 369 (1985).

Defendant first argues the trial court's reasons for denying his initial motion were erroneous. The trial court made references to the passage of time and the size and diversity of Mecklenburg County in its findings of fact, but did not describe these factors as the reasons for its decision. Noting the possible effects of time on an atmosphere of pervasive media coverage is not erroneous where defendant's motion was first considered in January 1995, more than eighteen months before his trial began. The trial court's recognition of the probable time frame for the trial as well as the size of the prospective jury pool was reasonable. Such factors can be expected to influence possible prejudice toward defendant. Although the evidence of pretrial publicity, most of which was favorable to defendant or factually neutral, was substantial at the time of defendant's motion, we cannot say the trial court abused its discretion in recognizing facts which, ultimately, may have impacted whether the environment for defendant's trial was prejudicial.

Furthermore, the trial court did not err in stating its belief that the best evidence of whether pretrial publicity was prejudicial or inflammatory was jurors' responses to *voir dire* questioning. This Court has repeatedly emphasized that " '[t]he best and most reliable evidence as to whether existing community prejudice will prevent a fair trial can be drawn from prospective jurors' responses to questions during the jury selection process.' " *State v. Jaynes*, 342 N.C. 249, 264, 464 S.E.2d 448, 458 (1995) (quoting *Madric*, 328 N.C. at 228, 400 S.E.2d at 34), *cert. denied*, 518 U.S. 1024, 135 L. Ed. 2d 1080 (1996). Our recognition in *Jaynes* of prospective juror responses as the most reliable evidence of potential juror prejudice does not preclude a pretrial change of venue in every case as argued by defendant in his brief. Nor is it a standard to be applied only by the appellate courts. Trial courts in this State have ordered venue changes in numerous cases where prejudice to the defendant has been apparent prior to trial. While juror responses may provide the most reliable evidence, other forms of evidence can provide a sufficient basis for a determination that a fair and impartial trial is reasonably unlikely. Defendant's first argument is without merit.

Defendant, in his second argument, contends identifiable prejudice was established when a juror with a previous opinion of defend-

ant's guilt sat on the jury. However, our review of the record indicates juror Thomas Bishop, who had formed an opinion about defendant's guilt, later clearly stated his ability to set aside that opinion and base his decision on the evidence and the law as presented. We presume that prospective jurors tell the truth in answering such questions because our courts could not function without the ability to rely on such presumptions. *See State v. Barnes*, 345 N.C. 184, 207, 481 S.E.2d 44, 56 (1997), *cert. denied*, 523 U.S. 1024, 140 L. Ed. 2d 473 (1998). Therefore, we presume juror Bishop was truthful in declaring his ability to consider only the evidence at trial. We have no evidence to suggest otherwise. Because the trial court could reasonably conclude defendant had not adequately proven actual prejudice based on the responses of the juror, it did not err in denying defendant's motion to change venue. *See Jaynes*, 342 N.C. at 265, 464 S.E.2d at 458.

Defendant's third argument relating to the infection of the jury pool by pervasive pretrial publicity is also meritless. Defendant cites *Jerrett*, 309 N.C. 239, 307 S.E.2d 339, as support for his argument. In *Jerrett*, this Court recognized that a defendant has met his burden to show prejudice where the totality of circumstances indicates pretrial publicity has so "infected" a jurisdiction that a defendant cannot receive a fair trial. *Id.* at 258, 307 S.E.2d at 349. The crimes in *Jerrett* occurred in Alleghany County, a small rural community with a population of 9,587 at the time of the trial. *Id.* at 252 n.1, 307 S.E.2d at 346 n.1. Examination of prospective jurors in *Jerrett* revealed that one-third of the jurors knew the victim or members of the victim's family and that many of the jurors knew possible witnesses for the prosecution. *Id.* at 257, 307 S.E.2d at 348-49.

The instant case is distinguishable from *Jerrett*. The population of Mecklenburg County at the time of defendant's arrest was approximately 511,433, *see North Carolina Manual 1993-1994*, at 879 (Lisa A. Marcus ed.), and reflected a large heterogeneous group of potential jurors in contrast to the small close-knit venire in *Jerrett*. Juror familiarity with the victims and their families is not present in this case as it was in *Jerrett*. While it is clear that a large number of potential jurors was exposed to information about the case through the media, this Court has consistently held that factual news accounts of the crimes and pretrial proceedings are not sufficient to establish prejudice against a defendant. *See State v. Dobbins*, 306 N.C. 342, 345, 293 S.E.2d 162, 164 (1982).

Notwithstanding this case's dissimilarity to *Jerrett*, the evidence presented was insufficient to show infection of the jury pool so as to

deprive defendant of a fair trial. In addition to media coverage, defendant points to the two telephone surveys as further evidence of a biased jury pool. The surveys indicated that media coverage of the crimes was widespread and that a large number of persons was aware of the crimes and defendant's identity. However, the surveys did not measure the prejudicial effect of the media coverage, including potential jurors' attitudes toward the presumption of innocence or their ability to confine their determinations as jurors to the evidence presented in court. *See State v. Richardson*, 308 N.C. 470, 480, 302 S.E.2d 799, 805 (1983) (a similar survey did not provide evidence of the prejudicial effect of publicity where it had not addressed the presumption of innocence or whether jurors could confine their decisions to the evidence presented in court). Although the surveys asked questions relating to the death penalty and defendant's guilt, answers to these questions outside the context of the presumption of innocence and the juror's duty to consider only the evidence presented at trial are not reliable evidence of bias or prejudice. Viewing the totality of the circumstances, including the amount of media coverage, the number of potential jurors available in Mecklenburg County, and the passage of time between defendant's arrest and his trial, we conclude there was not a reasonable likelihood that defendant could not receive a fair and impartial trial in Mecklenburg County. Defendant's assignment of error is overruled.

**[4]** By an assignment of error, defendant next contends the trial court erred by denying his motion to suppress his pretrial statements to police. On 7 November 1994, defendant filed a motion to suppress statements he made to police during a series of interviews which began on the afternoon of 12 March and continued through 13 March 1994. The trial court conducted an evidentiary hearing on that motion at the 27 March 1995 session of Superior Court, Mecklenburg County. On 20 April 1995, the trial court denied the motion and on 3 October 1996, filed a written order to that effect which contained extensive findings of fact and conclusions of law.

In his brief, defendant agrees with the trial court's findings of fact describing the events following his arrest. The extensive findings of fact are summarized as follows: Defendant was arrested 12 March 1994 at approximately 5:00 p.m. at a friend's apartment. Officers Gilbert Allred and Sidney Wright of the Charlotte-Mecklenburg Police Department placed defendant under arrest pursuant to an outstanding order for arrest on a misdemeanor larceny charge. The officers transported defendant to the Law Enforcement Center (LEC) rather

than the Intake Center where prisoners were normally taken. Both arresting officers testified that they observed no indications that defendant was under the influence of alcohol or drugs. He was "very calm and collected" but appeared tired and "a little wrinkled." Defendant was cooperative with the officers and did not object to being taken to see investigators at the LEC rather than the Intake Center. At the LEC, defendant was placed in an interview room and released to the custody of other officers.

The trial court found that Investigators Mark Corwin and Darrell Price met with defendant in an interview room at the LEC beginning at 6:43 p.m. that same day. The officers provided defendant with food and drink and allowed him regular breaks to use the restroom. There was no evidence defendant was deprived of food, drink, or the opportunity to use the restroom at any time during the entire interview process. During the initial interview, investigators and defendant talked about sports, his employment and military experience, and his biographical information. Defendant also voluntarily raised the issue of his drug use. He gave inconsistent answers about the last time he had used crack cocaine, indicating on one occasion that he had last used drugs the week before and on another occasion that he had used drugs that morning. However, there were no indications defendant was under the influence of any impairing substance or had been deprived of sleep at any time during the interviews. At 10:00 p.m., the investigators advised defendant of his *Miranda* rights which defendant said he understood and agreed to waive. Prior to administering the *Miranda* rights, the officers did not ask defendant about his drug use or the victims for whose murders he was a suspect. Officers asked no questions designed to elicit an incriminating response. However, defendant was under arrest and not free to leave pursuant to the larceny charge.

The trial court further found that after defendant was advised of his *Miranda* rights, Price and Corwin questioned defendant about the latest murders. Investigators C.E. Boothe, Jr., and William Ward, Jr., also questioned defendant during the evening of 12 March and the early morning of 13 March 1994. Investigator Tony Rice met with defendant at 5:07 a.m. on 13 March 1994. Defendant greeted Rice and was happy to see him because they knew each other. Questioning continued after Rice entered the room, and defendant became emotional when he was asked about his girlfriend, Sadie McKnight. Rice asked defendant if he was religious and whether he would mind if Rice said a prayer. Defendant said he did not mind. He cried during

the prayer. After the prayer, defendant sighed and then wrote a list of the names of the victims he had killed. He later gave a detailed, recorded confession concerning each of the victims. Defendant was fed while he gave his confession and was allowed to sleep from 7:30 a.m. until 11:45 a.m.

The trial court also found that at some point during the interviews, defendant requested to see his girlfriend and to hold his daughter. Ward advised defendant that the police would attempt to contact McKnight and Wanda Harrison, the mother of defendant's daughter. He also advised defendant that the police had no control over whether either would come to the station. The trial court further found that the officers did not view this request as a condition for defendant making a statement.

The trial court also found that there was no evidence defendant was coerced or intimidated in any way, nor was there evidence defendant indicated he wished to stop talking with officers or wanted to speak with an attorney. Magistrate Karen Johnson came to the LEC around noon and conducted a first appearance for defendant on murder warrants obtained by investigators. The trial court further found that Magistrate Johnson followed normal procedures and that her ability to be neutral and detached was not affected by going to the LEC.

The trial court found that after his appearance before Magistrate Johnson, defendant continued cooperating with police, providing individual confessions to each murder and taking police to recover articles of evidence. At no time did defendant request an attorney or indicate a desire to stop talking with police.

Defendant contends his pretrial statements to police should have been suppressed for three reasons: (1) police investigators violated N.C.G.S. § 15A-501; (2) investigators' deliberate delay in advising defendant of his *Miranda* rights violated defendant's right against self-incrimination; and (3) defendant's confessions were involuntary because police investigators induced him to waive his rights by agreeing to allow defendant to see his girlfriend and hold his daughter. We disagree.

Defendant first contends police investigators violated N.C.G.S. § 15A-501 by waiting nineteen hours to take defendant before a magistrate after his arrest, taking him to the LEC for questioning prior to his appearance before a magistrate, and waiting three and a half

hours after questioning began before advising defendant of his rights pursuant to *Miranda v. Arizona*, 384 U.S. 436, 16 L. Ed. 2d 694 (1966). Specifically, defendant argues investigators engaged in a deliberate strategy to obtain his confession by depriving him of his statutory and constitutional rights and the strategy amounted to a substantial violation of N.C.G.S. § 15A-501, which requires suppression of all the confessions given by defendant.

Several duties of police officers after they have arrested a suspect are described in N.C.G.S. § 15A-501:

> Upon the arrest of a person, with or without a warrant, but not necessarily in the order hereinafter listed, a law-enforcement officer:
>
> (1) Must inform the person arrested of the charge against him or the cause for his arrest.
>
> (2) Must, with respect to any person arrested without a warrant and, for purpose of setting bail, with respect to any person arrested upon a warrant or order for arrest, take the person arrested before a judicial official without unnecessary delay.
>
> (3) May, prior to taking the person before a judicial official, take the person arrested to some other place if the person so requests.
>
> (4) May, prior to taking the person before a judicial official, take the person arrested to some other place if such action is reasonably necessary for the purpose of having that person identified.
>
> (5) Must without unnecessary delay advise the person arrested of his right to communicate with counsel and friends and must allow him reasonable time and reasonable opportunity to do so.

N.C.G.S. § 15A-501 (1999). Evidence obtained as a result of a "substantial violation" of any provision in chapter 15A must be suppressed. *See* N.C.G.S. § 15A-974(2) (1999). The trial court, in determining whether a violation is substantial, must consider all of the circumstances, including the importance of the interest violated, the extent of the deviation, the willfulness of the deviation, and the deterrent value the exclusion of the evidence will provide. *See id.*; *State v.*

*Simpson*, 320 N.C. 313, 357 S.E.2d 332 (1987), *cert. denied*, 485 U.S. 963, 99 L. Ed. 2d 430 (1988). In order for mandatory suppression to apply, "a causal relationship must exist between the violation and the acquisition of the evidence sought to be suppressed." *State v. Richardson*, 295 N.C. 309, 322, 245 S.E.2d 754, 763 (1978).

Initially, we address the delay in taking defendant before a judicial official pursuant to N.C.G.S. § 15A-501(2). Defendant was arrested at approximately 5:00 p.m. on 12 March 1994 on the outstanding warrant for larceny. At the time of his arrest, defendant was a suspect in three murders which possessed similar characteristics. Each of these murders involved the strangulation of a female victim, and all had occurred within the previous month. With defendant already under arrest for larceny, investigators attempted to establish a rapport with defendant to facilitate their investigation of the murders. Defendant was cooperative and spoke with investigators about a number of unrelated topics. He also mentioned knowing two of the victims. During this period, defendant was fed and given opportunities to use the restroom. After open communication was established, investigators advised defendant of his *Miranda* rights and began questioning him about the murders and his relationships with the victims. At first, defendant acknowledged knowing several victims but did not admit his involvement in their deaths. He was unable to explain the number of people he knew who had died of unnatural causes. When Rice joined the interrogation, defendant listed the persons he had killed. Investigators were not aware that many of the murders to which defendant confessed were related. As investigators questioned defendant about each victim specifically, defendant confessed to the numerous rapes, sexual offenses, and robberies which accompanied the murders. Defendant continued to cooperate with investigators by providing explicit, sordid, and case-determinative details. Defendant gave complete tape-recorded confessions for each victim. After he completed the recordings, defendant asked to take a nap. Investigators brought a couch into the room where defendant was being questioned, and defendant slept there from approximately 7:30 a.m. until 11:45 a.m. Investigators woke defendant so that he could appear before a magistrate. Defendant was taken before Magistrate Johnson at approximately noon on 13 March 1994.

The dispositive issue here is whether defendant's confession resulted from the delay. This Court, on previous occasions, has held a confession obtained as a result of interrogation prior to an appearance before a magistrate was not obtained as a result of a substantial

violation of chapter 15A. *See, e.g., State v. Littlejohn,* 340 N.C. 750, 459 S.E.2d 629 (1995); *State v. Allen,* 323 N.C. 208, 372 S.E.2d 855 (1988), *sentence vacated on other grounds,* 494 U.S. 1021, 108 L. Ed. 2d 601 (1990); *State v. Martin,* 315 N.C. 667, 340 S.E.2d 326 (1986). In *Littlejohn,* a period of thirteen hours elapsed between the defendant's arrest and the time he was taken before a magistrate. *Littlejohn,* 340 N.C. at 758, 459 S.E.2d at 633. The defendant argued that he would not have confessed if he had been taken before a magistrate earlier. Nevertheless, we refused to find a substantial violation of chapter 15A because the defendant had been advised of his constitutional rights at the beginning of his interrogation and would have received the same notification by a magistrate. *Id.* Similarly, in the instant case, defendant was advised of his rights before he was asked questions regarding the crimes he was suspected of committing. Defendant has not shown he would not have confessed had he been advised of the same rights again by a magistrate. Therefore, we cannot say his confession was the result of the delay in defendant being taken before a magistrate. *See State v. Chapman,* 343 N.C. 495, 471 S.E.2d 354 (1996) (a delay of ten and a half hours was not unnecessary because of the number of crimes involved and the investigators' rights to conduct the interrogation). Moreover, because of the number of crimes to which defendant confessed and the amount of time necessary to record the details of the crimes, along with investigators' accommodation of defendant's request to sleep, we conclude the delay in taking defendant before a judicial official was not unnecessary within the meaning of N.C.G.S. § 15A-501(2).

As part of defendant's first argument, we also address whether there were substantial violations of subsections (3), (4), or (5) of N.C.G.S. § 15A-501 which resulted in defendant's confession. Subsections (3) and (4) allow police to take a defendant to a place, other than before a magistrate, upon a request by the defendant or to have the defendant identified. There is no evidence that either occurred in the instant case. Nevertheless, as stated above, there is no evidence that taking defendant to the LEC before he saw a magistrate caused him to confess. Therefore, no substantial violations of subsections (3) and (4) resulted. As to subsection (5), defendant was advised of his rights before investigators began any interrogation relating to the crimes in this case. Although investigators talked with defendant from approximately 6:45 p.m. until 10:00 p.m. before reading him his *Miranda* rights, there is no evidence police asked defendant about any of the crimes to which he later confessed or that any

portion of defendant's confession was a result of the delay during which he and investigators discussed unrelated subjects. For these reasons, we conclude there was no substantial violation of N.C.G.S. § 15A-501 requiring defendant's confession to be suppressed.

In his second argument, defendant contends the delay in advising him of his *Miranda* rights tainted his later confessions, requiring them to be suppressed. Defendant argues the strategy used by investigators to elicit his confession amounted to a "deliberately coercive or improper tactic" which undermined his free will and rendered his confession, given after he was advised of his *Miranda* rights, involuntary. He cites *Oregon v. Elstad*, 470 U.S. 298, 84 L. Ed. 2d 222 (1985), and *State v. Barlow*, 330 N.C. 133, 409 S.E.2d 906 (1991), as authority for his position. However, defendant's reliance is misplaced as both cases are inapposite to the issue before us.

In both *Elstad* and *Barlow*, the respective defendants made incriminating statements before they were advised of their *Miranda* rights. In *Elstad*, the United States Supreme Court's inquiry into whether a "coercive" or "improper" tactic undermined the defendant's free will was part of an analysis to determine if the later statements were tainted or caused by the prior, unwarned incriminating statement. *See Elstad*, 470 U.S. at 314, 84 L. Ed. 2d at 235. We performed a similar analysis in *Barlow. See Barlow*, 330 N.C. at 139, 409 S.E.2d at 910. In the instant case, defendant made no prior incriminating statement. His discussions with investigators dealt with subjects other than the crimes involved, and although defendant mentioned that he knew two of the victims and that he had used drugs, these statements were voluntary and not inculpatory. Defendant's later confessions could not be termed "fruit of the poisonous tree," *see Wong Sun v. United States*, 371 U.S. 471, 488, 9 L. Ed. 2d 441, 455 (1963), because there was no prior inadmissible statement or evidence to function as the "poisonous tree." Defendant's argument has no merit.

In his third argument, defendant contends his pretrial statements to police should have been suppressed because investigators induced him to confess by promising to allow him to see his girlfriend and daughter. He argues the promise led him to confess, rendering his confession involuntary and subject to suppression as a violation of his due process rights under the Fourteenth Amendment to the United States Constitution and Article I, Sections 19 and 23 of the North Carolina Constitution. We again disagree.

The voluntariness of a defendant's confession is determined by viewing the "totality of the circumstances." *State v. Corley*, 310 N.C. 40, 47, 311 S.E.2d 540, 545 (1984). To be considered improper and indicative of an involuntary confession, an inducement to confess must convey "hope" or "fear." *State v. Wilson*, 322 N.C. 91, 94, 366 S.E.2d 701, 703 (1988). An "improper inducement generating hope must promise relief from the criminal charge to which the confession relates, not to any merely collateral advantage." *State v. Pruitt*, 286 N.C. 442, 458, 212 S.E.2d 92, 102 (1975). Moreover, where a promise or statement indicating a defendant may receive some form of benefit is made in response to a solicitation by a defendant, the defendant's confession is not deemed involuntary. *See State v. Richardson*, 316 N.C. 594, 604, 342 S.E.2d 823, 831 (1986).

In the instant case, defendant made the request to investigating officers that he be allowed to see his girlfriend and daughter. Investigators' statements that they would attempt to contact defendant's girlfriend and the mother of his child were made only in response to defendant's request. While defendant referred to his request as a "condition" of his confession, there is no evidence investigators used the request as an inducement to obtain his confession. Further, investigators advised defendant that the police had no control over whether McKnight or Harrison would come to the station. Moreover, when asked whether his confession was given in "exchange" for the request to see his girlfriend and child, defendant said it was not. As defendant's request had no relation to relief from the charges faced by him, there was no improper inducement in this situation. *See Pruitt*, 286 N.C. at 458, 212 S.E.2d at 102. Defendant's argument is without merit, and this assignment of error is overruled.

## JURY SELECTION ISSUE

[5] By an assignment of error, defendant next contends the trial court erred by denying his challenge for cause of prospective juror Thomas Bishop. Defendant argues the record shows Bishop had formed an opinion regarding defendant's guilt which disqualified him from serving as a juror pursuant to N.C.G.S. § 15A-1212(6). During *voir dire*, Bishop indicated that he had formed an opinion as to defendant's guilt due, in part, to pretrial publicity and defense counsel's statement that the facts in the case were not in dispute. However, the trial court questioned Bishop, and the following exchange took place:

COURT: And would you be able to put aside what counsel has said and any pretrial information that you may have, namely what

STATE v. WALLACE

[351 N.C. 481 (2000)]

you have read and heard about the case previously, and base your determination on the evidence that is present[ed] in open court and the instructions on the law that I give you?

MR. BISHOP: Yes, sir.

Upon further questioning, Bishop repeatedly confirmed his ability to set aside any information he had received from pretrial publicity and from statements by counsel and decide the case based on the evidence and the law as given by the trial court.

Challenges to the jury panel and the competency of jurors are matters to be decided by the trial judge. *See* N.C.G.S. § 15A-1211(b) (1999). N.C.G.S. § 15A-1212 contains no language requiring mandatory dismissal of jurors and "merely lists the various grounds for making challenges to jurors." *State v. Corbett*, 309 N.C. 382, 389, 307 S.E.2d 139, 145 (1983). The portion of the statute in question provides that a juror may be removed by a challenge for cause on the ground that the juror "[h]as formed or expressed an opinion as to the guilt or innocence of the defendant." N.C.G.S. § 15A-1212(6) (1999). "The trial court is not required to remove from the panel every potential juror who has any preconceived opinions as to the potential guilt or innocence of a defendant." *State v. Cummings*, 326 N.C. 298, 308, 389 S.E.2d 66, 71 (1990). "Where the trial court can reasonably conclude from the *voir dire* examination that a prospective juror can disregard prior knowledge and impressions, follow the trial court's instructions on the law, and render an impartial, independent decision based on the evidence, excusal is not mandatory." *State v. Green*, 336 N.C. 142, 167, 443 S.E.2d 14, 29, *cert. denied*, 513 U.S. 1046, 130 L. Ed. 2d 547 (1994); *see also Irvin v. Dowd*, 366 U.S. 717, 6 L. Ed. 2d 751 (1961).

Defendant concedes in his brief that Bishop indicated his ability to set aside his opinion and render a verdict based on the law and evidence as presented in court. Defendant also concedes that this Court's prior decisions hold contrary to his argument on this issue. We perceive no reason to change or reverse our prior holdings, and we decline to do so. This assignment of error is overruled.

## GUILT/INNOCENCE PHASE

[6] By an assignment of error, defendant next contends the trial court erred by denying his motion *in limine* and overruling his objections to the cross-examination of defense experts regarding two additional and unrelated murders to which defendant confessed after his arrest. During his confession to the crimes at issue here, defendant

also confessed to killing Tashanda Bethea in South Carolina in April 1990 and Sharon Nance in North Carolina in May 1992. During his presentation of evidence, defendant offered the testimony of Colonel Robert K. Ressler, an expert in the fields of criminology, crime scene analysis, serial offenders, psychology of serial offenders, and criminal abnormal psychology, and Dr. Ann W. Burgess, an expert in the fields of serial offenders, crime classification, psycho-social development, and mental illness.

Col. Ressler testified regarding a classification system he used in studying serial offenders in which crimes and offenders were categorized as organized, disorganized, or mixed. These categories tend to correlate with the presence of a mental illness or disorder. Organized offenders tend to be free from actual mental illness but might display a type of sociopathic behavior. Disorganized offenders tend to exhibit characteristics of actual mental illness. Mixed offenders display characteristics of organization and disorganization. In Col. Ressler's opinion, the crimes in this case fit into the mixed category, exhibiting signs of both organization and disorganization. On direct examination, defendant's counsel highlighted the disorganized characteristics in the nine murders charged here in an effort to prove defendant's diminished mental capacity or mental illness. On cross-examination, the State elicited testimony from Col. Ressler that the crimes, including the two earlier murders, displayed signs of organization, which would point to a lack of mental illness.

Dr. Burgess, on direct examination, testified that defendant was unable to form specific intent to commit the crimes with which he was charged because of mental illness. The cross-examination of Dr. Burgess related to her opinion that defendant suffered from mental illness and that he created fantasies, acted upon them, and could not differentiate the fantasies from reality. The State questioned Dr. Burgess about the uncharged murder of Bethea with regard to whether defendant was relating a fantasy or reality to the expert during his interview. Dr. Burgess mentioned both Bethea and Nance in a group of victims who had been choked when the State asked her if defendant had exercised control over the victims. The trial court gave a limiting instruction to the jury after each mention of Bethea and Nance during Dr. Burgess' cross-examination and during Col. Ressler's cross-examination.

Defendant contends the cross-examination was improper under Rule 403 because it was prejudicial and had no probative value as

impeachment under Rule 705. He concedes Rule 705 allows cross-examination of the basis of an expert's opinion even if the evidence would not ordinarily be allowed, but argues the cross-examination is subject to the Rule 403 balancing test for prejudice. Defendant also argues Rule 705 does not give the State "carte blanche to introduce the basis of an adverse expert opinion regardless of its prejudicial effect and probative value." *State v. Coffey*, 336 N.C. 412, 421, 444 S.E.2d 431, 436 (1994). For the reasons set forth below, we find no merit in defendant's assignment of error.

Rule 705 allows for cross-examination of an expert witness regarding the basis for any opinions given.

> The expert may testify in terms of opinion or inference and give his reasons therefor without prior disclosure of the underlying facts or data, unless an adverse party requests otherwise, in which event the expert will be required to disclose such underlying facts or data on direct examination or voir dire before stating the opinion. *The expert may in any event be required to disclose the underlying facts or data on cross-examination.* There shall be no requirement that expert testimony be in response to a hypothetical question.

N.C.G.S. § 8C-1, Rule 705 (1999) (emphasis added). In the instant case, both experts testified that they were able to classify or diagnose defendant, in part, by studying the acts to which he confessed. Col. Ressler and Dr. Burgess reviewed information about the two uncharged murders in formulating their opinions. Under the broad scope of Rule 705, cross-examination relating to the two murders was permissible to probe the basis for the experts' opinions. *See State v. Lyons*, 343 N.C. 1, 468 S.E.2d 204, *cert. denied*, 519 U.S. 894, 136 L. Ed. 2d 167 (1996). Furthermore, under Rule 403, the determination of whether relevant evidence should be excluded is a matter left to the sound discretion of the trial court, and the trial court can be reversed only upon a showing of abuse of discretion. *See State v. Pierce*, 346 N.C. 471, 490, 488 S.E.2d 576, 587 (1997). In the instant case, defendant has not demonstrated any abuse of discretion by the trial court. To the contrary, a review of the record reveals the trial court was aware of the potential danger of unfair prejudice to defendant and was careful to give a proper instruction limiting the jury's consideration of the evidence solely to the basis for the experts' opinions. The trial court gave the instruction during each disputed instance of cross-examination. For these reasons, we conclude

defendant was not prejudiced by this cross-examination. This assignment of error is overruled.

[7] By an assignment of error, defendant next contends the trial court erred in denying parts of his requested instructions on the element of deliberation. The requested instructions consisted of portions of case law which provided additional definitions for deliberation, including:

> The intent to kill must arise from "a fixed determination previously formed after weighing the matter." *State v. Myers*, 309 N.C. 78[, 305 S.E.2d 506 (1983)].
>
> . . . .
>
> . . . Deliberation refers to a "steadfast resolve and deep-rooted purpose, or a design formed after carefully considering the consequences." *State v. Thomas*, 118 N.C. 1113[, 24 S.E. 431] (1896).
>
> . . . .
>
> While the terms "premeditate" and "deliberate" are sometimes used interchangeably, they have separate legal meanings. " 'Premeditate' involves the idea of prior consideration, while 'deliberation' rather indicates reflection, a weighing of the consequences of the act in more or less calmness." *State v. Exum*, 138 N.C. 599[, 50 S.E. 283] (1905).
>
> . . . "The true test [of deliberation]," however, "is not the duration of time as much as it is the extent of the reflection." N.C.P.I.[—Crim.] 206.14; *State v. Buchanan*, 287 N.C. 408[, 215 S.E.2d 80] (1975).

(Citation omitted.) The trial court instructed the jury, utilizing the North Carolina pattern jury instructions, which include the following portion defining deliberation:

> that the defendant acted with deliberation, which means that he acted while he was in a cool state of mind. This does not mean that there had to be a total absence of passion or emotion. If the intent to kill was formed with a fixed purpose, not under the influence of some suddenly aroused violent passion, it is immaterial that the defendant was in a state of passion or excited when the intent was carried into effect.

N.C.P.I.—Crim. 206.14 (1994). Defendant concedes this Court has approved the use of the pattern instructions for first-degree murder, including the element of deliberation, *see, e.g., State v. Lewis*, 346 N.C. 141, 484 S.E.2d 379 (1997); *State v. Jones*, 342 N.C. 628, 467 S.E.2d 233 (1996), but argues this Court's cases and the pattern instructions have "strayed from the clear intent of the General Assembly's 1893 creation of the crime of first-degree murder and from solid precedent." Defendant argues the definitions of deliberation in his requested instructions give it a common-sense meaning and adequately supplement the pattern jury instructions, which refer to a "cool state of mind," but not a "total absence of passion or emotion." N.C.P.I.—Crim. 206.14. Defendant argues the pattern instructions are "meaningless and confusing" without the supplementation. We disagree.

This Court has consistently held that "a trial court is not required to give a requested instruction verbatim. Rather, when the request is correct in law and supported by the evidence, the court must give the instruction in substance." *State v. Ball*, 324 N.C. 233, 238, 377 S.E.2d 70, 73 (1989). Our review of the pattern instructions reveals they provide an accurate definition of deliberation. Defendant's proposed instructions merely articulate variations on the definition. Thus, the trial court gave defendant's requested instructions in substance. Ever mindful of our duty to scrutinize the pattern instructions for federal and state constitutional and statutory conflicts, *see Jones*, 342 N.C. at 633, 467 S.E.2d at 235, we conclude the trial court did not err in refusing to give defendant's additional requested instructions. This assignment of error is overruled.

## CAPITAL SENTENCING PROCEEDING

[8] Defendant assigns error to the trial court's denial of his motion for a peremptory instruction regarding two statutory mitigating circumstances: N.C.G.S. § 15A-2000(f)(2), "[t]he capital felony was committed while the defendant was under the influence of mental or emotional disturbance," and N.C.G.S. § 15A-2000(f)(6), "[t]he capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired." Defendant argues the instructions were required because there was uncontroverted evidence in the record supporting both circumstances. We disagree.

Upon request, a trial court should give a peremptory instruction for any mitigating circumstance, whether statutory or nonstatutory, if

it is supported by uncontroverted evidence. *See State v. White*, 349 N.C. 535, 568, 508 S.E.2d 253, 274 (1998), *cert. denied*, 527 U.S. 1026, 144 L. Ed. 2d 779 (1999). Conversely, if the evidence in support of the mitigating circumstance is controverted, a peremptory instruction is not required. *See State v. Womble*, 343 N.C. 667, 683, 473 S.E.2d 291, 300 (1996), *cert. denied*, 519 U.S. 1095, 136 L. Ed. 2d 719 (1997).

In the instant case, defendant contends the testimony of Dr. Burgess during the guilt/innocence phase of the trial and the testimony of Dr. Faye Sultan, a clinical psychologist, during the sentencing phase of the trial was uncontroverted and supported peremptory instructions for the (f)(2) and (f)(6) mitigating circumstances. Dr. Burgess testified that defendant suffered from mental illness which negated his ability to form specific intent. Dr. Sultan testified that defendant suffered from a number of mental disorders which impaired his ability to conform his conduct to the law.

After a complete review of the record, we conclude the testimony upon which defendant relies was controverted by evidence which tended to show defendant's behavior was not consistent with the mitigating circumstances. In fact, the issues of whether defendant was under the influence of a mental or emotional disturbance and whether he was able to conform his actions to the law were heatedly contested by the prosecution. The State presented testimony by Sadie McKnight, who had lived with defendant for two years until shortly before he was arrested. She testified that she had not observed anything unusual about defendant and had not known him to experience hallucinations. Moreover, the State presented evidence that defendant held numerous jobs involving management responsibilities during the time these crimes were committed and that he maintained a relationship with his girlfriend and other women during this time which did not involve any type of abuse. Further, defendant was able to carry out nine premeditated, calculated, and vicious murders while carefully avoiding detection. As the evidence was, in fact, controverted, the trial court did not err, and this assignment of error is overruled.

**[9]** Next, defendant makes two assignments of error regarding the N.C.G.S. § 15A-2000(e)(6) aggravating circumstance, which provides, "[t]he capital felony was committed for pecuniary gain." Defendant argues the trial court's instruction was erroneous and the trial court erred in submitting the aggravating circumstance to the jury for consideration in the murder of Caroline Love. First, we

STATE v. WALLACE

[351 N.C. 481 (2000)]

address the propriety of the trial court's instruction. The trial court gave the following instruction: "A murder is committed for pecuniary gain if the defendant, when he commits it, has obtained, or intends or expects to obtain, money or some other thing which can be valued in money, either as compensation for committing it, or as a result of the death of the victim." Defendant claims the instruction allows the jury to find the existence of the aggravating circumstance in a situation where the defendant obtained money or something of value as a result of the murder rather than where the defendant committed the murder for the purpose of obtaining the money or valuable thing. Defendant did not object at trial but asserts the instruction was plain error with respect to the three victims for which it was submitted: Caroline Love, Shawna Hawk, and Valencia Jumper. We disagree.

"[T]o reach the level of 'plain error' . . . , the error in the trial court's jury instructions must be 'so fundamental as to amount to a miscarriage of justice or which probably resulted in the jury reaching a different verdict than it otherwise would have reached.' " State v. Collins, 334 N.C. 54, 62, 431 S.E.2d 188, 193 (1993) (quoting State v. Bagley, 321 N.C. 201, 213, 362 S.E.2d 244, 251 (1987), cert. denied, 485 U.S. 1036, 99 L. Ed. 2d 912 (1988)). This Court has previously addressed the sufficiency of the pecuniary gain instruction in the context of plain error. In State v. Bacon, 337 N.C. 66, 99-100, 446 S.E.2d 542, 559-60 (1994), cert. denied, 513 U.S. 1159, 130 L. Ed. 2d 1083 (1995), this Court declined to find plain error with regard to the pecuniary gain instruction because the trial court's instruction was in accordance with the North Carolina pattern jury instruction and because the wording on the issues and recommendation form indicated that the jury found that pecuniary gain was the purpose for the murder. Similarly, in State v. Bishop, 343 N.C. 518, 556-57, 472 S.E.2d 842, 862-63 (1996), cert. denied, 519 U.S. 1097, 136 L. Ed. 2d 723 (1997), this Court again declined to find plain error where the instruction given was substantially similar to the pattern jury instruction, and the jury answered the question of whether the murder was committed for pecuniary gain in the affirmative.

In the instant case, the trial court's instruction for the pecuniary gain aggravating circumstance mirrored the pattern jury instruction. See N.C.P.I.—Crim. 150.10 (1998). On the issues and recommendation form for the murders of Love, Hawk, and Jumper, the circumstance was stated: "Was this murder committed for a pecuniary gain?" The jurors answered "yes" in each case, indicating they found that the

purpose behind the murder was pecuniary gain. In light of our prior holdings and the jury's responses, we decline to find plain error.

**[10]** Next, we address the sufficiency of the evidence in support of the submission of the pecuniary gain aggravating circumstance in the murder of Caroline Love. Defendant contends the evidence was insufficient because it did not show that obtaining a roll of quarters from Love was the purpose for the murder. We disagree.

"In determining the sufficiency of the evidence to submit an aggravating circumstance to the jury, the trial court must consider the evidence in the light most favorable to the State, with the State entitled to every reasonable inference to be drawn therefrom." *State v. Syriani*, 333 N.C. 350, 392, 428 S.E.2d 118, 141, *cert. denied*, 510 U.S. 948, 126 L. Ed. 2d 341 (1993). The State presented evidence that Love had obtained a roll of quarters from her employer as she left work the night of her murder. The manager of the Bojangles' restaurant where Love worked, John Chandler, testified that Love asked him for a roll of quarters in exchange for a ten-dollar bill so that she could do her laundry. Investigator Rice testified that Chandler told him about the quarters and that he was unable to find them when he searched Love's home. Further, in his statement to police which was given in redacted form to the jury, defendant admitted taking the quarters from Love's apartment. Taken in the light most favorable to the State, this evidence is such that a jury could reasonably conclude pecuniary gain was a motive for the murder of Caroline Love. This assignment of error is overruled.

**[11]** Defendant next assigns error to the trial court's overruling of defendant's objection to statements made by the prosecution during its sentencing phase closing argument. Defendant assigns error to the following argument:

> I may tell you that in the Caroline Love case, Aggravating Circumstance Number 1 is, it was during the course of a rape. What does that tell you? That's a one-liner, isn't it? Remember what it was. Think about a women [sic] being raped. Think about that violation that she went through, that Shawna Hawk went through, and I could list each of those names for you again. You think about that. You think about being murdered during the course of being raped.

The trial court overruled defendant's objection to the last sentence in the preceding argument. Defendant contends the ruling was contrary .

to this Court's holding in *State v. McCollum*, 334 N.C. 208, 433 S.E.2d 144 (1993), *cert. denied*, 512 U.S. 1254, 129 L. Ed. 2d 895 (1994).

In *McCollum*, this Court held that an argument asking jurors " 'to put themselves in place of the victims will not be condoned.' " *Id.* at 224, 433 S.E.2d at 152 (quoting *United States v. Pichnarcik*, 427 F.2d 1290, 1292 (9th Cir. 1970)). However, this Court has consistently allowed arguments where the prosecution has asked the jury to imagine the emotions and fear of a victim. *See State v. Warren*, 348 N.C. 80, 109, 499 S.E.2d 431, 447, *cert. denied*, 525 U.S. 915, 142 L. Ed. 2d 216 (1998). In the instant case, the prosecutor did not ask the jury members to put themselves in the place of the victim; rather, the prosecutor asked the jury to think about the murder and the rape occurring simultaneously as alleged in the aggravating circumstance. This assignment of error is overruled.

**[12]** Defendant also assigns error to the trial court's denial of his motion for mistrial based on the prosecution's improper argument. In addition to the statement above, defendant also objected to the following argument of the prosecution:

> The State asked each and every one of you during jury deliberations, would you promise not to base your verdict on sympathy for the victims or for the Defendant. And you agreed not to.

> Why does the Defense not want you to? Because in that sympathy game, ladies and gentlemen of the jury, it's a hands-down victory. That's not what we're here about. The State could fill this courtroom with the cries of mothers and fathers—

The trial court sustained defendant's objection to the last sentence above, allowed his motion to strike, and instructed the jury not to consider the statement. Defendant contends the declaration of a mistrial was warranted because the prosecution injected grossly improper considerations into an already emotionally charged case, which prevented him from obtaining a fair sentencing hearing. We disagree.

A trial court must declare a mistrial "if there occurs during the trial an error or legal defect in the proceedings, or conduct inside or outside the courtroom, resulting in substantial and irreparable prejudice to the defendant's case." N.C.G.S. § 15A-1061 (1999). "The scope of appellate review . . . is limited to whether in denying the motion[] for a mistrial, there has been an abuse of judicial discretion." *State v. Boyd*, 321 N.C. 574, 579, 364 S.E.2d 118, 120 (1988).

The trial court sustained defendant's objection to the statement above and instructed the jury not to consider it. Any prejudice to defendant was remedied by the trial court's instruction. As the statements upon which defendant based his motion for mistrial were either proper or not prejudicial, we discern no "irreparable prejudice" arising from the prosecutor's argument. The trial court did not abuse its discretion by denying defendant's motion; therefore, this assignment of error is overruled.

## PRESERVATION ISSUES

Defendant raises eleven additional issues which he concedes have been decided previously by this Court contrary to his position: (1) the trial court erred in denying defendant's motions to increase the number of peremptory challenges; (2) the jury's determination that the murders were "especially heinous, atrocious, or cruel" was based on unconstitutionally vague instructions which failed to distinguish death-eligible murders from murders not death-eligible; (3) the trial court's capital sentencing jury instructions defining defendant's burden to prove mitigating circumstances to the satisfaction of each juror did not adequately guide the jury's discretion about the requisite degree of proof; (4) the trial court erred by allowing the jury to refuse to give effect to mitigating evidence if the jury deemed the evidence not to have mitigating value; (5) the trial court's instruction about the course of conduct aggravating circumstance was vague and overbroad; (6) the trial court erred by submitting, over defendant's objection, defendant's age as a mitigating circumstance; (7) the trial court erred by instructing jurors they must be unanimous to answer "no" for Issues One, Three, and Four, and to reject the death penalty in their punishment recommendation; (8) the trial court erred by denying defendant's motion to question prospective jurors about their understanding of the meaning of a life sentence for first-degree murder and of parole eligibility for a life sentence for first-degree murder; (9) the trial court erred by denying defendant's motion to bifurcate the guilt/innocence and penalty phases of the trial into two proceedings with separate juries; (10) the trial court erred by sentencing defendant to death because the death penalty is inherently cruel and unusual; and (11) the trial court erred by sentencing defendant to death because the North Carolina capital sentencing scheme is unconstitutionally vague and overbroad.

Defendant makes these arguments for the purpose of permitting this Court to reexamine its prior holdings and to preserve these argu-

ments for any possible further judicial review in this case. We have thoroughly considered defendant's arguments on these issues and find no compelling reason to depart from our prior holdings. Accordingly, these assignments of error are overruled.

## PROPORTIONALITY REVIEW

[13] Finally, defendant contends the death sentences imposed were excessive or disproportionate. Having concluded that defendant's trial and capital sentencing proceeding were free from prejudicial error, it is our statutory duty to ascertain as to each murder (1) whether the evidence supports the jury's findings of the aggravating circumstances upon which the sentence of death was based; (2) whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor; and (3) whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. N.C.G.S. § 15A-2000(d)(2) (1999).

In the instant case, defendant was convicted of nine counts of first-degree murder. Each conviction was based both on premeditation and deliberation and on the felony murder rule.

Following the capital sentencing proceeding as to the Love murder, the jury found the following submitted aggravating circumstances: the murder was committed for the purpose of avoiding lawful arrest, N.C.G.S. § 15A-2000(e)(4); the murder was committed by defendant while defendant was engaged in the commission of a rape, N.C.G.S. § 15A-2000(e)(5); the murder was committed by defendant while defendant was engaged in the commission of a sexual offense, N.C.G.S. § 15A-2000(e)(5); the murder was committed for pecuniary gain, N.C.G.S. § 15A-2000(e)(6); the murder was especially heinous, atrocious, or cruel, N.C.G.S. § 15A-2000(e)(9); and the murder was part of a course of conduct in which defendant engaged and which included the commission by defendant of other crimes of violence against another person or persons, N.C.G.S. § 15A-2000(e)(11).

As to the Hawk murder, the jury found the following submitted aggravating circumstances: the murder was committed for the purpose of avoiding lawful arrest, N.C.G.S. § 15A-2000(e)(4); the murder was committed by defendant while defendant was engaged in the commission of a rape, N.C.G.S. § 15A-2000(e)(5); the murder was committed by defendant while defendant was engaged in the commission of a sexual offense (fellatio), N.C.G.S. § 15A-2000(e)(5); the

murder was committed by defendant while defendant was engaged in the commission of a sexual offense (cunnilingus), N.C.G.S. § 15A-2000(e)(5); the murder was committed for pecuniary gain, N.C.G.S. § 15A-2000(e)(6); the murder was especially heinous, atrocious, or cruel, N.C.G.S. § 15A-2000(e)(9); and the murder was part of a course of conduct in which defendant engaged and which included the commission by defendant of other crimes of violence against another person or persons, N.C.G.S. § 15A-2000(e)(11).

As to the Spain murder, the jury found the following submitted aggravating circumstances: the murder was committed by defendant while defendant was engaged in the commission of a rape, N.C.G.S. § 15A-2000(e)(5); the murder was committed by defendant while defendant was engaged in the commission of a robbery, N.C.G.S. § 15A-2000(e)(5); the murder was especially heinous, atrocious, or cruel, N.C.G.S. § 15A-2000(e)(9); and the murder was part of a course of conduct in which defendant engaged and which included the commission by defendant of other crimes of violence against another person or persons, N.C.G.S. § 15A-2000(e)(11).

As to the Jumper murder, the jury found the following submitted aggravating circumstances: the murder was committed by defendant while defendant was engaged in the commission of a rape, N.C.G.S. § 15A-2000(e)(5); the murder was committed by defendant while defendant was engaged in the commission of a sexual offense, N.C.G.S. § 15A-2000(e)(5); the murder was committed by defendant while defendant was engaged in the commission of arson, N.C.G.S. § 15A-2000(e)(5); the murder was committed for pecuniary gain, N.C.G.S. § 15A-2000(e)(6); the murder was especially heinous, atrocious, or cruel, N.C.G.S. § 15A-2000(e)(9); and the murder was part of a course of conduct in which defendant engaged and which included the commission by defendant of other crimes of violence against another person or persons, N.C.G.S. § 15A-2000(e)(11).

As to the Stinson murder, the jury found the following submitted aggravating circumstances: the murder was committed by defendant while defendant was engaged in the commission of a rape, N.C.G.S. § 15A-2000(e)(5); the murder was committed by defendant while defendant was engaged in the commission of a sexual offense, N.C.G.S. § 15A-2000(e)(5); the murder was especially heinous, atrocious, or cruel, N.C.G.S. § 15A-2000(e)(9); and the murder was part of a course of conduct in which defendant engaged and which included the commission by defendant of other crimes of violence against another person or persons, N.C.G.S. § 15A-2000(e)(11).

As to the Mack murder, the jury found the following submitted aggravating circumstances: the murder was committed by defendant while defendant was engaged in the commission of a rape, N.C.G.S. § 15A-2000(e)(5); the murder was committed by defendant while defendant was engaged in the commission of a robbery, N.C.G.S. § 15A-2000(e)(5); the murder was especially heinous, atrocious, or cruel, N.C.G.S. § 15A-2000(e)(9); and the murder was part of a course of conduct in which defendant engaged and which included the commission by defendant of other crimes of violence against another person or persons, N.C.G.S. § 15A-2000(e)(11).

As to the Baucom murder, the jury found the following submitted aggravating circumstances: the murder was committed by defendant while defendant was engaged in the commission of a rape, N.C.G.S. § 15A-2000(e)(5); the murder was committed by defendant while defendant was engaged in the commission of a robbery, N.C.G.S. § 15A-2000(e)(5); the murder was especially heinous, atrocious, or cruel, N.C.G.S. § 15A-2000(e)(9); and the murder was part of a course of conduct in which defendant engaged and which included the commission by defendant of other crimes of violence against another person or persons, N.C.G.S. § 15A-2000(e)(11).

As to the Henderson murder, the jury found the following submitted aggravating circumstances: the murder was committed for the purpose of avoiding lawful arrest, N.C.G.S. § 15A-2000(e)(4); the murder was committed by defendant while defendant was engaged in the commission of a rape, N.C.G.S. § 15A-2000(e)(5); the murder was committed by defendant while defendant was engaged in the commission of a robbery, N.C.G.S. § 15A-2000(e)(5); the murder was especially heinous, atrocious, or cruel, N.C.G.S. § 15A-2000(e)(9); and the murder was part of a course of conduct in which defendant engaged and which included the commission by defendant of other crimes of violence against another person or persons, N.C.G.S. § 15A-2000(e)(11).

As to the Slaughter murder, the jury found the following submitted aggravating circumstances: the murder was committed by defendant while defendant was engaged in the commission of a rape, N.C.G.S. § 15A-2000(e)(5); the murder was committed by defendant while defendant was engaged in the commission of a robbery, N.C.G.S. § 15A-2000(e)(5); the murder was especially heinous, atrocious, or cruel, N.C.G.S. § 15A-2000(e)(9); and the murder was part of a course of conduct in which defendant engaged and which included

the commission by defendant of other crimes of violence against another person or persons, N.C.G.S. § 15A-2000(e)(11).

As to each murder, three statutory mitigating circumstances were submitted for the jury's consideration: (1) the murder was committed while defendant was under the influence of mental or emotional disturbance, N.C.G.S. § 15A-2000(f)(2); (2) defendant's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired, N.C.G.S. § 15A-2000(f)(6); and (3) defendant's age at the time of the crime, N.C.G.S. § 15A-2000(f)(7). The jury found N.C.G.S. § 15A-2000(f)(2) for each murder, but found N.C.G.S. § 15A-2000(f)(6) only in the murders of Henderson, Baucom, and Slaughter, and did not find N.C.G.S. § 15A-2000(f)(7) for any of the murders. As to each murder, of the thirty-seven nonstatutory mitigating circumstances submitted, twenty-four were found by the jury to exist and have mitigating value.

After a thorough review of the record, including the transcripts, briefs, and oral arguments, we conclude the evidence fully supports the aggravating circumstances found by the jury. Further, we find no indication the sentences of death were imposed under the influence of passion, prejudice, or any other arbitrary factor. We therefore turn to our final statutory duty of proportionality review.

The purpose of proportionality review is to "eliminate the possibility that a person will be sentenced to die by the action of an aberrant jury." *State v. Holden*, 321 N.C. 125, 164-65, 362 S.E.2d 513, 537 (1987), *cert. denied*, 486 U.S. 1061, 100 L. Ed. 2d 935 (1988). Proportionality review also acts "[a]s a check against the capricious or random imposition of the death penalty." *State v. Barfield*, 298 N.C. 306, 354, 259 S.E.2d 510, 544 (1979), *cert. denied*, 448 U.S. 907, 65 L. Ed. 2d 1137 (1980). In conducting proportionality review, we compare the present case with other cases in which this Court has concluded that the death penalty was disproportionate. *See McCollum*, 334 N.C. at 240, 433 S.E.2d at 162. This Court has determined the death sentence to be disproportionate on seven occasions: *State v. Benson*, 323 N.C. 318, 372 S.E.2d 517 (1988); *State v. Stokes*, 319 N.C. 1, 352 S.E.2d 653 (1987); *State v. Rogers*, 316 N.C. 203, 341 S.E.2d 713 (1986), *overruled on other grounds by State v. Gaines*, 345 N.C. 647, 483 S.E.2d 396, *cert. denied*, 522 U.S. 900, 139 L. Ed. 2d 177 (1997), *and by State v. Vandiver*, 321 N.C. 570, 364 S.E.2d 373 (1988); *State v. Young*, 312 N.C. 669, 325 S.E.2d 181 (1985); *State v. Hill*, 311 N.C. 465, 319 S.E.2d 163 (1984); *State v. Bondurant*, 309 N.C.

674, 309 S.E.2d 170 (1983); *State v. Jackson,* 309 N.C. 26, 305 S.E.2d 703 (1983).

We conclude this case is not substantially similar to any case in which this Court has found the death penalty disproportionate. First, defendant was convicted of nine counts of first-degree murder. This Court has never found a sentence of death disproportionate in a case where the jury has found a defendant guilty of murdering more than one victim. *See State v. Goode,* 341 N.C. 513, 552, 461 S.E.2d 631, 654 (1995).

Additionally, the jury convicted defendant for each murder under the theory of premeditation and deliberation. This Court has stated that "[t]he finding of premeditation and deliberation indicates a more cold-blooded and calculated crime." *State v. Artis,* 325 N.C. 278, 341, 384 S.E.2d 470, 506 (1989), *sentence vacated on other grounds,* 494 U.S. 1023, 108 L. Ed. 2d 604 (1990).

Finally, in each murder, the jury found the following three aggravating circumstances: (1) "[t]he capital felony was committed while the defendant was engaged, or was an aider or abettor, in the commission of, or an attempt to commit, or flight after committing or attempting to commit, any homicide, robbery, rape or a sex offense, arson, burglary, kidnapping, or aircraft piracy or the unlawful throwing, placing, or discharging of a destructive device or bomb," N.C.G.S. § 15A-2000(e)(5); (2) "[t]he capital felony was especially heinous, atrocious, or cruel," N.C.G.S. § 15A-2000(e)(9); and (3) "[t]he murder for which the defendant stands convicted was part of a course of conduct in which the defendant engaged and which included the commission by the defendant of other crimes of violence against another person or persons," N.C.G.S. § 15A-2000(e)(11). There are four statutory aggravating circumstances which, standing alone, this Court has held sufficient to support a sentence of death. *See Bacon,* 337 N.C. at 110 n.8, 446 S.E.2d at 566 n.8. The N.C.G.S. § 15A-2000(e)(5), (e)(9), and (e)(11) statutory aggravating circumstances, which the jury found here, are among those four. *See id.*

We also compare this case with the cases in which this Court has found the death penalty to be proportionate. While we review all of the cases in the pool of "similar cases" when engaging in our statutorily mandated duty of proportionality review, we reemphasize that we will not undertake to discuss or cite all of those cases each time we carry out that duty. *State v. Williams,* 308 N.C. 47, 81, 301 S.E.2d 335, 356, *cert. denied,* 464 U.S. 865, 78 L. Ed. 2d 177 (1983). Because of the

number of victims and the vicious, serial nature of the crimes, this case is unlike any other in North Carolina history. As such, it suffices to say this case is more similar to cases in which we have found the sentence of death proportionate than to those in which we have found it disproportionate.

Accordingly, we conclude defendant received a fair trial and capital sentencing proceeding, free from prejudicial error, and the sentences of death recommended by the jury and entered by the trial court are not disproportionate.

NO ERROR.